980 F.2d 437
 61 USLW 2340, 79 Ed. Law Rep. 396
 Robert Ian SHERMAN, for himself and as natural guardian for
Richard Harry Sherman, a minor son, Plaintiffs-Appellants,
v.
COMMUNITY CONSOLIDATED SCHOOL DISTRICT 21 OF WHEELING
TOWNSHIP, et al., Defendants-Appellees.
 No. 91-1684.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 24, 1992.
Decided Nov. 20, 1992.
 
 Richard Grossman (argued), Dannen, Crane, Heyman & Simon, Chicago, Ill., for plaintiffs-appellants.
 Robert P. Reske (argued), Gurion & Lewis, David W. Ott, Ott & Platt, Chicago, Ill., for defendants-appellees Community Consol. School Dist. 21 of Wheeling Tp., Descarpentrie, Ferne Garrett.
 Susan Frederick Rhodes, Asst. Atty. Gen., Office of Atty. Gen., Chicago, Ill., for defendant-appellee Neil F. Hartigan.
 Before CUMMINGS, EASTERBROOK, and MANION, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 "[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). A state therefore may not compel any person to recite the Pledge of Allegiance to the flag. On similar grounds, Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), adds that a state may not compel any person to display its slogan. Does it follow that a pupil who objects to the content of the Pledge may prevent teachers and other pupils from reciting it in his presence? We conclude that schools may lead the Pledge of Allegiance daily, so long as pupils are free not to participate.
 * In 1979 Illinois enacted this statute: "The Pledge of Allegiance shall be recited each school day by pupils in elementary educational institutions supported or maintained in whole or in part by public funds." Ill.Rev.Stat. ch. 122 p 27-3. We held in Palmer v. Board of Education, 603 F.2d 1271 (7th Cir.1979), that states may require teachers to lead the Pledge and otherwise communicate patriotic values to their students. The right of the school board to decide what the pupils are taught implies a corresponding right to require teachers to act accordingly. See also Webster v. New Lenox School District, 917 F.2d 1004 (7th Cir.1990). Richard Sherman, who attends elementary school in Wheeling Township, Illinois, and his father Robert challenge the premise of Palmer that schools may employ a curriculum including the Pledge of Allegiance among its exercises. Since 1954 the Pledge has included the words "under God," 68 Stat. 249, which the Shermans contend violates the establishment and free exercise clauses of the first amendment. The full Pledge is: "I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all." 36 U.S.C. § 172.
 
 
 1
 The district court's first opinion, 714 F.Supp. 932 (N.D.Ill.1989), concluded that the Shermans have standing to challenge the recitation of the Pledge but expressed doubt that a third plaintiff--the Society of Separationists, Inc., a group of atheists of which Sherman pere is president--is entitled to litigate. The court denied defendants' motion to dismiss but invited plaintiffs to amend their complaint.
 
 
 2
 Following the amendment, the court dismissed the Society as a party. 745 F.Supp. 1371 (1990). The Society has not appealed, so we do not mention it again. The new complaint added the Attorney General of Illinois as a defendant. The Attorney General reiterated the contention that the Shermans lack standing; the court disagreed. The Attorney General also contended that the district court should abstain and that the challenge is unripe because Richard has not been penalized for his refusal to recite the Pledge. The court rejected both arguments. It did not address the Attorney General's submission that the eleventh amendment bars a suit against that office (the Shermans did not name the incumbent as a party in his personal capacity).
 
 
 3
 A third opinion, 758 F.Supp. 1244 (1991), granted the defendants' motions for summary judgment. The court held that the state's pledge law satisfies all three elements of the approach to the establishment clause in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971): it has a secular purpose, does not advance religion, and does not entangle the government in religion. Coerced readings of the Pledge would pose difficulties under the free speech and free exercise clauses, but the court concluded that the statute is not coercive as written or in application. Although p 27-3 says that the Pledge "shall be recited each school day by pupils", it does not say by all pupils, and the absence of any penalty implies that the pupils are entitled to keep silent. Affidavits from the superintendent of schools, the principal of Richard's school, and Richard's first grade teacher all stated that no pupil was compelled to recite the Pledge, to stand during the Pledge or place his hand over his heart, or to leave if he would not join in, and that no one was penalized in any way for remaining silent and seated. Contrast Lipp v. Morris, 579 F.2d 834 (3d Cir.1978) (an obligation to stand at attention while other students recite the Pledge is forbidden compulsion); Goetz v. Ansell, 477 F.2d 636 (2d Cir.1973) (same). Any peer pressure to conform that Richard may have experienced, the court believed, does not justify silencing pupils who are willing to recite the Pledge.
 
 II
 
 4
 Defendants renew their jurisdictional arguments. The Shermans disdained to address them, asserting that only defendants who file cross-appeals may contest the jurisdiction of the district court. The Shermans overlook the enduring principle that judges must consider jurisdiction as the first order of business, and that parties must help the courts do so. Philbrook v. Glodgett, 421 U.S. 707, 720-22, 95 S.Ct. 1893, 1901-02, 44 L.Ed.2d 525 (1975); Fusari v. Steinberg, 419 U.S. 379, 387 n. 12, 95 S.Ct. 533, 538 n. 12, 42 L.Ed.2d 521 (1975); id. at 390-91, 95 S.Ct. at 539-40 (Burger, C.J., concurring). Nothing can justify adjudication of a suit in which the plaintiff lacks standing or there is some other obstacle to justiciability. Defendants fulfilled their duties to the court, while the lawyer representing the plaintiffs slighted his.
 
 
 5
 The eleventh amendment deprives federal courts of jurisdiction to consider most suits against states. State agencies or officials sued in their official capacity are "the state" for this purpose, Will v. Michigan Department of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), unless the plaintiff satisfies the requirements of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). See also Hafer v. Melo, --- U.S. ----, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Plaintiffs sued the Attorney General of Illinois in his official capacity only, seeking both damages and a declaratory judgment that p 27-3 violates the Constitution. The eleventh amendment cleanly bars the award of damages in an official-capacity suit. Whether it also bars declaratory relief depends on the theory of liability. Plaintiffs have not articulated any theory under which Ex parte Young supports a suit against the Attorney General, who has never threatened the Shermans with prosecution and as far as we can tell has no authority to do so. (States' Attorneys, elected in each county, are the public prosecutors in Illinois. Paragraph 27-3 does not prescribe a penalty, so these officials also have nothing to do with the subject.) Plaintiffs apparently named the office of the Attorney General in an effort to obtain a judgment binding the State of Illinois as an entity, a step that Congress did not authorize when enacting 42 U.S.C. § 1983 and that the eleventh amendment does not permit in the absence of such authorization. See Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The Attorney General must be dismissed as a party.
 
 
 6
 Defendants' other jurisdictional objections have less punch. Richard Sherman, obliged by the school-attendance laws to be present during the Pledge and the potential object of coercion to participate, has standing to challenge the statute. Abington School District v. Schempp, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963). His father has derivative standing as his guardian. The subject is ripe for adjudication. The Pledge law is on the books, being enforced at Richard's school by daily recitation. That school officials do not compel Richard to participate may bear on the merits but does not make the subject less appropriate for decision. Cf. Lee v. Weisman, --- U.S. ----, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (adjudicating a challenge to a prayer at a high school graduation, with no Justice doubting justiciability).
 
 
 7
 Doctrines that counsel abstention do not imply that the court lacks subject-matter jurisdiction. The defendants' contention that the district court should have abstained while awaiting clarification of the meaning of the state's law, if accepted, would require us to alter its judgment. To obtain such an alteration, the defendants needed to file appeals of their own. Federal Energy Administration v. Algonquin SNG, Inc., 426 U.S. 548, 560 n. 11, 96 S.Ct. 2295, 2302 n. 11, 49 L.Ed.2d 49 (1976). See Robert L. Stern, When to Cross-Appeal or Cross-Petition--Certainty or Confusion?, 87 Harv.L.Rev. 763 (1974).
 
 
 8
 Now that the case has reached our court, certification to the Supreme Court of Illinois would be the best way to find out whether the state's law requires each pupil to recite the Pledge of Allegiance. Houston v. Hill, 482 U.S. 451, 470-71, 107 S.Ct. 2502, 2514, 96 L.Ed.2d 398 (1987). None of the parties has asked us to seek the views of the Supreme Court of Illinois. We could do so on our own, but the reason the district judge gave for not abstaining is an equally cogent reason for our not certifying: "[P]laintiffs maintain that having the Pledge led by the principal daily is inherently coercive and therefore violative of plaintiffs' rights. Thus, even if an Illinois court interprets the statute to exempt children who cannot say the Pledge for religious or political reasons, the court would still have to resolve the question of whether school officials' leading of the Pledge, pursuant to the statute, results in unconstitutional coercion." 745 F.Supp. at 1374. Circuit Rule 52 permits us to certify a question of state law only when the answer "will control the outcome" of the case. See also Rule 20 of the Rules of the Supreme Court of Illinois (certification authorized when the answer "may be determinative of the said cause").
 
 
 9
 Although we could make the state court's answer controlling by first deciding all of the Shermans' constitutional arguments, leaving only the meaning of state law unresolved, such a course invites advisory adjudication. Thus the best course is to interpret the state law for ourselves. We cannot rewrite a law in order to "save" it, Houston, 482 U.S. at 468-69, 107 S.Ct. at 2513; K-S Pharmacies, Inc. v. American Home Products Corp., 962 F.2d 728, 730 (7th Cir.1992); American Booksellers Ass'n v. Hudnut, 771 F.2d 323, 332-34 (7th Cir.1985), affirmed without opinion, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986), but federal courts interpret state statutes in constitutional cases no less than in cases under the diversity jurisdiction. Planned Parenthood v. Casey, --- U.S. ----, ----, 112 S.Ct. 2791, 2822, 120 L.Ed.2d 674 (1992); Frisby v. Schultz, 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988). No interpretation we announce will bind Illinois or other school districts, see Kucharek v. Hanaway, 902 F.2d 513, 517 (7th Cir.1990), but it will control how Wheeling Township must treat Richard, which is all the Shermans are entitled to.
 
 III
 
 10
 If Illinois requires every pupil to recite the Pledge, then Barnette scuttles the statute, and we need not consider whether "under God" distinguishes the Pledge from other patriotic exercises. Plaintiffs contend that the language of p 27-3--"The Pledge of Allegiance shall be recited each school day by pupils in elementary educational institutions supported or maintained in whole or in part by public funds."--is unambiguous and compulsory.
 
 
 11
 Defendants persuaded the district court that the lack of a penalty for silence eliminates any compulsion, or at least shows that the state legislature did not mean to require children to recite the Pledge. True, there was a penalty (expulsion from school) in Barnette. Yet other cases dealing with readings, prayers, or periods of silence in the classroom thought the absence of a formal penalty irrelevant. E.g., Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); Lee v. Weisman, --- U.S. ----, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Oliver Wendell Holmes looked to penalties in order to see how the law affected those who regard their own welfare exclusively. The Path of the Law, 10 Harv.L.Rev. 457, 460-61 (1897), reprinted in Collected Legal Papers 167, 173 (1920). Many people obey laws just because they represent the will of the majority expressed through democratic forms. See Kurowski v. Krajewski, 848 F.2d 767, 774-75 (7th Cir.1988). They revere law for the sake of civility, harmony, and consideration of others--values that schools try to inculcate. More: penalties may be real (the displeasure of one's teacher can be formidable) even though not administered by judges. How ironic if Richard Sherman's first experience with law were to teach him that the legal sanction expresses the full meaning of a rule. Then the lesson of the Pledge of Allegiance would be cynicism rather than patriotism. Looking at the law through the lens of penalties is useful for many purposes, but not when the task is to teach civic virtue.
 
 
 12
 What the law requires of principals, teachers, and pupils depends on the language it contains rather than the penalty it omits. And what p 27-3 says is that the Pledge "shall be recited each school day by pupils" in public schools. Some pupils? Willing pupils? All pupils? It does not specify. If it means "all pupils" then it is blatantly unconstitutional; if it means "willing pupils" then the most severe constitutional problem dissolves. When resolving statutory ambiguities, the Supreme Court of Illinois adopts readings that save rather than destroy state laws. E.g., Country Mutual Insurance Co. v. Knight, 40 Ill.2d 423, 240 N.E.2d 612 (1968). Given Barnette, which long predated enactment of this statute, it makes far more sense to interpolate "by willing pupils" than "by all pupils." School administrators and teachers satisfy the "shall" requirement by leading the Pledge and ensuring that at least some pupils recite. Leading the Pledge is not optional, see Palmer, but participating is. This makes sense of the statute without imputing a flagrantly unconstitutional act to the State of Illinois.
 
 
 13
 This understanding is consistent with the practice in the Wheeling schools. The superintendent of schools, the principal of Riley School (which Richard attends), and his first grade teacher when this suit began, all filed affidavits stating that neither Richard nor any other pupil is compelled to recite the Pledge, to place his hand over his heart, to stand, or to leave the room while others recite. Marilyn Barden, Richard's teacher, averred that she brooks no hazing of those who decline to participate, and that she has never noticed any. The only contrary suggestion comes from Robert Sherman's affidavit, which states: "Defendant Garrett, principal of the school attended by my son, asks my son to stand with one hand over his heart and participate with the other pupils in reciting the pledge." But as this affidavit does not reflect personal knowledge--Robert Sherman does not say that he has ever been in Richard's class during the recitation or that he has heard principal Garrett make such a demand--the district court properly disregarded it. Robert does not even aver that his son told him this, and Richard did not file an affidavit of his own. Affidavits offered in opposition to motions for summary judgment "shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence". Fed.R.Civ.P. 56(e). The same defect prevents giving force to Robert Sherman's assertion that Richard was hassled by other children on the playground because of his refusal to recite the Pledge. Children can be exceedingly cruel to one another, but the rancor (not in any event attributable to the State of Illinois) must be established by admissible evidence.
 
 
 14
 We have not overlooked some juicy tidbits of legislative history that plaintiffs proffer. Senator Netsch spoke against the adoption of p 27-3, expressing a belief that the bill could not coexist with Barnette. Senator Knuppel replied: "it amazes me that these people get up and read that kind of garbage that Jackson [Justice Robert Jackson, author of the majority opinion in Barnette ] had there, his advise [sic] from the Supreme Court, I rate just about as highly as I do the advise [sic] from Congress." Senate Debates, 81st Illinois General Assembly, May 22, 1979, at 272. Senator Lemke then called for the election of federal judges and added: "Maybe we ought to abolish the Supreme Court and have a dictatorship like in Russia because in Russia at least they say a pledge of allegiance to their own flag." Ibid. It is hard to believe that an elected official of Illinois prefers totalitarian government to democracy under law just because dictatorships employ more patriotic slogans, which dictators may deem necessary to their success. That two state senators are able to bring obloquy upon themselves does not help us know whether p 27-3 means "all pupils" rather than "willing pupils". Senator Nimrod, the bill's sponsor, treated the recitation as noncompulsory. Id. at 270-71. Statements on the floor of the state's lower chamber may be read either way. These unenlightening exchanges do not show that Illinois enacted a law that would be stillborn under Barnette.
 
 
 15
 Notwithstanding the lack of penalties or efforts by teachers to induce pupils to recite, there remains social pressure to do so and a sense of exclusion when one's beliefs enforce silence during a ceremony others welcome. When discussing the Pledge of Allegiance, four Justices remarked: "[I]t borders on sophistry to suggest that the 'reasonable' atheist would not feel less than a 'full membe[r] of the political community' every time his fellow Americans recited, as part of their expression of patriotism and love for country, a phrase he believed to be false." Allegheny County v. Pittsburgh ACLU, 492 U.S. 573, 673, 109 S.Ct. 3086, 3143, 106 L.Ed.2d 472 (1989) (Kennedy, J., joined by Rehnquist, C.J., and White & Scalia, JJ.). Concerns of this kind, among others, led Justice Kennedy (this time speaking for a majority in Lee v. Weisman ) to treat prayer during a high school graduation as a form of compulsion, even though the student may remain silent without overt penalty. Engel v. Vitale, 370 U.S. at 430-31, 82 S.Ct. at 1267, the first of the school-prayer cases, expressed a similar conclusion. We have postponed to Part IV discussion of the effect of "under God". But perhaps the rationale of Barnette, when joined with the school-prayer cases, equates social pressure with legal pressure. If as Barnette holds no state may require anyone to recite the Pledge, and if as the prayer cases hold the recitation by a teacher or rabbi of unwelcome words is coercion, then the Pledge of Allegiance becomes unconstitutional under all circumstances, just as no school may read from a holy scripture at the start of class.
 
 
 16
 As an analogy this is sound. As an understanding of the first amendment it is defective--which was Justice Kennedy's point in Allegheny. The religion clauses of the first amendment do not establish general rules about speech or schools; they call for religion to be treated differently. Recall that for now we are treating the Pledge as a patriotic expression, even though the objections to public patriotism may be religious (as they were in Barnette ). Patriotism is an effort by the state to promote its own survival, and along the way to teach those virtues that justify its survival. Public schools help to transmit those virtues and values. Separation of church from state does not imply separation of state from state. Schools are entitled to hold their causes and values out as worthy subjects of approval and adoption, to persuade even though they cannot compel, and even though those who resist persuasion may feel at odds with those who embrace the values they are taught.
 
 
 17
 Consider what a general assimilation of religion to patriotism and other values would mean for the public schools. The majority in Lee remarked, --- U.S. at ----, 112 S.Ct. at 2657: "By the time they are seniors, high school students no doubt have been required to attend classes and assemblies and to complete assignments exposing them to ideas they find distasteful or immoral or absurd or all of these." They are required to read books promoting ideas they find wicked. Sometimes their creed may teach that reading such material is itself sinful. Canon law in the Roman Catholic Church, and equivalent rules of other religions, restricts the reading of books that misrepresent or undermine the faith. See Redmond A. Burke, What is the Index? (1952). (The Catholic Church suspended publication of the Index Librorum Prohibitorum in 1966 but did not abolish the distinction between moral and immoral literature.) Cases arising out of religious beliefs that particular books should not be read include Mozert v. Hawkins County Board of Education, 827 F.2d 1058, 1061-62 (6th Cir.1987), and Smith v. Mobile Board of School Commissioners, 827 F.2d 684 (11th Cir.1987). See also Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Students not only read books that question or conflict with their tenets but also write essays about them and take tests--questions for which their teachers prescribe right answers, which the students must give if they are to receive their degrees. The diversity of religious tenets in the United States ensures that anything a school teaches will offend the scruples and contradict the principles of some if not many persons. The problem extends past government and literature to the domain of science; the religious debate about heliocentric astronomy is over, but religious debates about geology and evolution continue. An extension of the school-prayer cases could not stop with the Pledge of Allegiance. It would extend to the books, essays, tests, and discussions in every classroom.
 
 
 18
 A pupil who takes exception to the prescribed curriculum of the public schools--whether the textbooks or the class discussions or the civic ceremonies such as the Pledge of Allegiance--is asserting a right to accommodation of his political or religious beliefs. Humane government often calls for accommodation; programs such as tuition vouchers serve this interest without offending other constitutional norms. Witters v. Washington Department of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). See also Michael W. McConnell, The Selective Funding Problem: Abortions and Religious Schools, 104 Harv.L.Rev. 989 (1991). But see Zobrest v. Catalina Foothills School District, 963 F.2d 1190 (9th Cir.1992), cert. granted, --- U.S. ----, 113 S.Ct. 52, 121 L.Ed.2d 21 (1992). Government nonetheless retains the right to set the curriculum in its own schools and insist that those who cannot accept the result exercise their right under Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), and select private education at their own expense. The private market supports a profusion of schools, many tailored to religious or cultural minorities, making the majoritarian curriculum of the public schools less oppressive. We agree with Judge Boggs that "school boards may set curricula bounded only by the Establishment Clause" even though pupils may find the books and classroom discourse offensive or immoral. Mozert, 827 F.2d at 1080 (concurring opinion). By remaining neutral on religious issues, the state satisfies its duties under the free exercise clause. Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). All that remains is Barnette itself, and so long as the school does not compel pupils to espouse the content of the Pledge as their own belief, it may carry on with patriotic exercises. Objection by the few does not reduce to silence the many who want to pledge allegiance to the flag "and to the Republic for which it stands".
 
 IV
 
 19
 All of this supposes that the Pledge is a secular rather than sectarian vow. Everything would be different if it were a prayer or other sign of religious devotion. Does "under God" make the Pledge a prayer, whose recitation violates the establishment clause of the first amendment?
 
 
 20
 The district court trudged through the three elements identified by the Court in Lemon, concluding that the Pledge passes every test. Of course Lemon was not devised to identify prayer smuggled into civic exercises, and its status as a general-purpose tool for administering the establishment clause is in doubt. Rumblings of discontent are frequent. The Court heard Lee v. Weisman in large part to reconsider Lemon, and Lee concluded without renewing Lemon's lease. The majority opinion reserved decision on the future of Lemon. --- U.S. at ----, 112 S.Ct. at 2655. Three members of the majority signed an opinion employing Lemon, --- U.S. at ---- - ----, 112 S.Ct. at 2663-64 (Blackmun, J., joined by Stevens & O'Connor, JJ.), but one member of this group has expressed doubts. Aguilar v. Felton, 473 U.S. 402, 426-30, 105 S.Ct. 3232, 3245-47, 87 L.Ed.2d 290 (1985) (O'Connor, J., dissenting). The author of the majority opinion in Lee has disparaged Lemon, see Allegheny, 492 U.S. at 655-56, 109 S.Ct. at 3134 (opinion of Kennedy, J.). The fifth member of the majority in Lee wrote a concurring opinion that did not rely on or endorse Lemon. --- U.S. at ----, 112 S.Ct. at 2667-78 (Souter, J.). And four Justices proposed to jettison Lemon forthwith. --- U.S. at ----, 112 S.Ct. at 2685 (Scalia, J., dissenting, joined by Rehnquist, C.J., and White & Thomas, JJ.). So we are not disposed to resolve this case by parsing Lemon.
 
 
 21
 Our approach is more direct. Must ceremonial references in civic life to a deity be understood as prayer, or support for all monotheistic religions, to the exclusion of atheists and those who worship multiple gods? You can't understand a phrase such as "Congress shall make no law respecting an establishment of religion" by syllogistic reasoning. Words take their meaning from social as well as textual contexts, which is why "a page of history is worth a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921) (Holmes, J.). Unless we are to treat the founders of the United States as unable to understand their handiwork (or, worse, hypocrites about it), we must ask whether those present at the creation deemed ceremonial invocations of God as "establishment." They did not. See Allegheny, 492 U.S. at 671-73, 109 S.Ct. at 3142-43 (opinion of Kennedy, J.).
 
 
 22
 James Madison, the author of the first amendment, issued presidential proclamations of religious fasting and thanksgiving.[1] 1] Thomas Jefferson, who refused on separationist grounds to issue thanksgiving proclamations,[2] nonetheless signed treaties sending ministers to the Indians.[3] The tradition of thanksgiving proclamations began with President Washington, who presided over the constitutional convention.[4] From the outset, witnesses in our courts have taken oaths on the Bible, and sessions of court have opened with the cry "God save the United States and this honorable Court." Jefferson's Declaration of Independence contains multiple references to God (for example: "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness."). When Madison and Jefferson wrote their famous declarations supporting separation of church and state, they invoked the name of the Almighty in support.[5]
 
 
 23
 The Founders' tradition has endured. Presidents still issue proclamations of thanksgiving. Details such as the Pledge of Allegiance and the motto on the coinage testify to its force. The Pledge tracks Lincoln's Gettysburg Address, which ends with a wish "that this nation, under God, shall have a new birth of freedom and that government of the people, by the people, for the people, shall not perish from the earth." The second inaugural address of that great statesman and poet concludes: "With malice toward none; with charity for all; with firmness in the right, as God gives us to see the right, let us strive on to finish the work we are in; to bind up the nation's wounds; to care for him who shall have borne the battle, and for his widow, and his orphan--to do all which may achieve and cherish a just and lasting peace among ourselves, and with all nations." Pupils who study this address with care will find 14 references to God among its 699 words.
 
 
 24
 When it decided Engel v. Vitale, the first of the school-prayer cases, the Court recognized this tradition and distinguished ceremonial references to God from supplications for divine assistance: "There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored in this instance." 370 U.S. at 435 n. 21, 82 S.Ct. at 1269 n. 21. To the same effect see Schempp, 374 U.S. at 306-08, 83 S.Ct. at 1615-16 (Goldberg, J., joined by Harlan, J., concurring). Lynch v. Donnelly, 465 U.S. 668, 676, 104 S.Ct. 1355, 1361, 79 L.Ed.2d 604 (1984), includes the Pledge in a list of civic exercises with religious connotations, which the Court implied are permissible. See also id. at 693, 104 S.Ct. at 1369 (O'Connor, J., concurring), expressing the view that Thanksgiving, "In God We Trust" and similar "government acknowledgments of religion serve ... the legitimate secular purposes of solemnizing public occasions ... and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, [these] practices are not understood as conveying approval of particular religious beliefs."
 
 
 25
 Justice Brennan, among the most stalwart of separationists, expressed similar thoughts when concurring in Schempp, 374 U.S. at 303-04, 83 S.Ct. at 1614:
 
 
 26
 [W]e have simply interwoven the motto [In God We Trust] so deeply into the fabric of our civil polity that its present use may well not present that type of involvement which the First Amendment prohibits. This general principle might also serve to insulate the various patriotic exercises and activities used in the public schools and elsewhere which, whatever may have been their origins, no longer have a religious purpose or meaning. The reference to divinity in the revised pledge of allegiance, for example, may merely recognize the historical fact that our Nation was believed to have been founded "under God." Thus reciting the pledge may be no more of a religious exercise than the reading aloud of Lincoln's Gettysburg Address, which contains an allusion to the same historical fact.
 
 
 27
 By the time of Marsh v. Chambers, 463 U.S. 783, 818, 103 S.Ct. 3330, 3349, 77 L.Ed.2d 1019 (1983) (dissenting opinion), Justice Brennan was equivocal: "I frankly do not know what should be the proper disposition of features of our public life such as 'God save the United States and this Honorable Court,' 'In God We Trust,' 'One Nation Under God,' and the like. I might well adhere to the view expressed in Schempp that such mottoes are consistent with the Establishment Clause, not because their import is de minimis, but because they have lost any true religious significance." In Lynch, 465 U.S. at 716, 104 S.Ct. at 1382 (dissenting opinion), Justice Brennan concluded that "the reference to God contained in the Pledge of Allegiance to the flag can best be understood, in Dean Rostow's apt phrase, as a form of 'ceremonial deism,' protected from Establishment Clause scrutiny chiefly because [it has] lost through rote repetition any significant religious content." (Footnote omitted.) This court adopted such an approach when observing in ACLU v. St. Charles, 794 F.2d 265, 271 (7th Cir.1986), that both "In God We Trust" and Christmas trees are secular, having lost their original religious significance. See also Allegheny, 492 U.S. at 616, 109 S.Ct. at 3113 (opinion of Blackmun, J.).
 
 
 28
 An outcry in dissent that one or another holding logically jeopardizes the survival of this tradition always provokes assurance that the majority opinion carries no such portent. Engel was the first of these, and Allegheny, 492 U.S. at 602-03, 109 S.Ct. at 3106, the most recent: "Our previous opinions have considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that the government may not communicate an endorsement of religious belief.... We need not return to the subject of 'ceremonial deism,' ... because there is an obvious distinction between creche displays and references to God in the motto and the pledge." Plaintiffs observe that the Court sometimes changes its tune when it confronts a subject directly. True enough, but an inferior court had best respect what the majority says rather than read between the lines. If the Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously. If the Justices are just pulling our leg, let them say so.
 
 
 29
 The judgment of the district court with respect to the Attorney General of Illinois is vacated, and that portion of the case is remanded with instructions to dismiss for want of jurisdiction. In all other respects the judgment is affirmed.
 
 
 30
 MANION, Circuit Judge, concurring.
 
 
 31
 I concur with the court's fine opinion and conclusion that reciting the Pledge of Allegiance does not offend the establishment clause. I write separately to emphasize that we need not totally denude the Pledge by reducing its language to the lowest common denominator of "ceremonial deism" as favored by Justice Brennan. A civic reference to God does not become permissible under the First Amendment only when it has been repeated so often that it is sapped of religious significance. Such an approach implies that phrases like "in God we trust" or "under God", when initially used on American coinage or in the Pledge of Allegiance, violated the establishment clause because they had not yet been rendered meaningless by repetitive use. As this court shows, the Founders demonstrate by their behavior that the First Amendment was not intended to prohibit states from sanctioning ceremonial invocations of God. Such state action simply does not amount to an establishment of religion.
 
 
 32
 Another problem with the concept of "ceremonial deism" is that it selects only religious phrases as losing their significance through rote repetition. Why only "under God"? Why not "indivisible", "liberty and justice for all"? Do not these equally repeated phrases also lose their meaning under the logic of "ceremonial deism"? The answer, quite simply, is that a court cannot deem any words to lose their meaning over the passage of time. Each term used in public ceremony has the meaning intended by the term.
 
 
 33
 There is a significant difference in a result which strikes down the Pledge as an endorsement of religion, and one which leaves the Pledge intact, accompanied by the official pronouncement that it is meaningless. While under the first alternative the Pledge is prohibited from civic functions, under the second alternative the Pledge is allowed, and people are free to ignore the pronouncement of this court, and recite the Pledge with any degree of meaning they desire.
 
 
 34
 There is no need, however, to apply either alternative. The Pledge of Allegiance with all of its intended meaning does not effectuate an establishment of religion. If legislative prayer based upon the Judeo-Christian tradition is permissible under Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and a Christmas nativity scene erected by a city government is permissible under Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), then certainly the less specific reference to God in the Pledge of Allegiance cannot amount to an establishment of religion. We need not drain the meaning from the reference to reach this conclusion.
 
 
 
 [1]
 See Leonard W. Levy, The Establishment Clause: Religion and the First Amendment 100 (1986). In 1817, after leaving office, Madison confessed that these proclamations violated the principles of separation for which he stood but pleaded "the legal aphorism de minimis non curat lex." Elizabeth Fleet (ed.), Madison's "Detached Memoranda", 3 William & Mary Quarterly 534, 559 (1946), reprinted in Philip B. Kurland & Ralph Lerner (eds.), 5 The Founders' Constitution 104 (1987)
 
 
 [2]
 See his letter to Rev. Samuel Miller, in 5 The Founders' Constitution 98-99
 
 
 [3]
 The treaties are collected in Robert L. Cord, Separation of Church and State: Historical Fact and Current Fiction 261-70 (1982)
 
 
 [4]
 E.g., the Proclamation of October 3, 1789, which begins: "Whereas it is the duty of all nations to acknowledge the providence of Almighty God, to obey His will, to be grateful for His benefits, and humbly to implore His protection and favor" and then sets Thursday, November 26, 1789, as a day "to be devoted ... to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be; that we may then all unite in rendering unto Him our sincere and humble thanks for His kind care", and much more in the same vein. 5 The Founders' Constitution 94. Washington issued this proclamation on the joint recommendation of both Houses of Congress, ibid., which only days before (on September 25) had sent the text of the establishment clause to the states for ratification
 
 
 [5]
 Here is the preamble to Virginia's Act for Establishing Religious Freedom, which Jefferson drafted in 1779 (and the state enacted in 1785): "Well aware that the opinions and belief of men depend not on their own will, but follow involuntarily the evidence proposed to their minds, that Almighty God hath created the mind free, and manifested his Supreme will that free it shall remain, by making it altogether insusceptible of restraint: That all attempts to influence it by temporal punishments or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the holy author of our religion, who being Lord both of body and mind, yet chose not to propagate it by coercions on either, as was in his Almighty power to do, but to extend it by its influence on reason alone". 5 The Founders' Constitution 77