H.S. on her own behalf and as parent and next friend of her minor child, J.S., Plaintiff,

v.

HUNTINGTON COUNTY COMMUNITY SCHOOL CORPORATION, Defendant.

No. 1:08 CV 271.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 19, 2009.

Jacquelyn E. Bowie-Suess, ACLU of Indiana, Indianapolis, IN, for Plaintiff.

Codie J. Ross, Linda A. Polley, Orfej P. Najdeski, Hunt Suedhoff Kalamaros LLP, Fort Wayne, IN, for Defendant.

### *OPINION and ORDER*

JAMES T. MOODY, District Judge.

Plaintiff H.S., on her own behalf and as a parent of her child, J.S., has filed a complaint (DE # 9) and a motion for a preliminary injunction (DE # 13) against defendant Huntington County Community School Corporation. Defendant opposed the injunction (DE # 26), and moved to dismiss plaintiff's complaint (DE # 32). This court referred both of these matters to Magistrate Judge Cosbey for a report and recommendation (DE # 19; DE # 38), which the court issued after a hearing (DE # 48; DE # 50).

Defendant objects (DE # 52; DE # 53) to the report and recommendation, and plaintiff has responded (DE # 54). For the reasons explained below, the court will overrule defendant's objections and adopt the report and recommendation—thus denying the motion to dismiss, and granting, in part, the motion for a preliminary injunction.

## I. BACKGROUND

Magistrate Judge Cosbey provided a thorough synopsis of the facts in his report and recommendation (DE # 50 at 4–9), and the parties submitted a stipulation of facts (DE # 46), so the court sees no need to exhaustively detail the events leading up to this lawsuit.

### *A. Relevant Facts*

Plaintiff is a parent of J.S., a third grade student at Horace Mann Elementary school, which is a part of defendant Huntington County Community School Corporation. (DE # 46 at 1.) As allowed by Indiana state law, defendant operates a religious "time release" program, enabling children to leave their normal classroom routines and receive religious instruction during the school day. IND.CODE § 20–33–2–19; (DE # 46 at 1–2; DE # 50 at 4.) Under this law, defendant has promulgated a policy allowing students to participate in religious time release programs for no more than 120 minutes a week. (DE # 46 at 1.) In defendant's district, only one organization currently provides such instruction—the Associated Churches of Huntington County (ACHC). (*Id.* at 2; DE # 50 at 4.)

Logistically, ACHC's program consists of bringing a trailer to various elementary schools, where their employees escort students from the school doors to the trailer, deliver a 30 minute religious-themed lesson, and return them to the doors of the school. (DE # 46 at 2–3; DE # 50 at 4–5.) These sessions take place once a week. (DE # 46 at 2.) During the trips to Horace Mann, the trailer is parked in the front parking lot, roughly fifty feet from the school's front entrance, occupying several visitor parking spaces, and sitting within plain sight of one of the school's playgrounds. (DE # 50 at 5.) From the outside, the trailers display no religious iconography or markings. (*Id.*) Defendant sets no education guidelines or exercises any control over the content of ACHC's program whatsoever. (*Id.*) ACHC hires and employs its own teachers, and pays its

own utility bills (at Horace Mann it plugs its trailer into an outside electrical outlet that is billed to ACHC directly). (*Id.* at 867–68; DE # 46 at 2–3.)

In order to participate in this program, defendant requires written permission slips, known as "request forms," from each student's parent. (DE # 46 at 2; DE # 50 at 6–7.) Students who do not provide a signed request form are kept in their normal classrooms while their participating classmates are released to ACHC's instructors. (DE # 46 at 3.) During this period, non-participating students do homework, read, or receive individual instruction. (*Id.*) In J.S.'s current grade, 97% of the students participate in ACHC's program. (DE # 50 at 4.)

In the Fall of 2008, J.S. was taken into the ACHC trailer and directly given a pamphlet advertising the program and containing a request form by an employee of ACHC, with the school's apparent consent and without plaintiff's permission. (DE # 46 at 3.) This practice has since stopped, and defendant claims it will now only distribute ACHC's information and request forms in the way that it distributes literature from any other outside group. (*Id.* at 3–4.)

Plaintiff and her child object to defendant allowing ACHC to place its trailer on school property for the purpose of conducting its religious teachings during school hours. (DE # 46 at 5.) J.S. is legally obligated to attend Horace Mann by Indiana law, *see* IND.CODE §§ 20–33–2–4; 20–33–2–5; 20–26–11–2, plaintiff must go to her child's school to attend school functions as a parent, and her child encounters ACHC's trailer at school. (DE # 50 at 6–9.)

ACHC claims that there is no reasonable way to relocate the trailer off of Horace Mann's property and continue to run the program in its current time allotment, and thus contends that granting an injunction in this case would end the organization's program.[1] (DE # 46 at 5–6; DE # 50 at 9.)

## B. Procedural Background

After filing and amending her complaint, plaintiff moved for a preliminary injunction, requesting that the court enjoin defendant from allowing any release time program to take place on school property during school hours and alleging that this practice violated the Establishment Clause of the First Amendment of the U.S. Constitution.[2] (DE # 13; DE # 14.) This court then referred the matter to Magistrate Judge Cosbey for a report and recommendation. (DE # 19.) Defendant responded to the injunction motion (DE # 26), as did ACHC itself (DE # 34),

---

**1.** Defendant makes three objections to the Findings of Fact made by Magistrate Judge Cosbey. (DE # 53 at 2–4.) Plaintiff accedes to the first two objections (DE # 54 at 1), and the court does not view them as particularly relevant. In its third objection, defendant objects to the court's finding that plaintiff's child "encounters the mobile classroom at school." Since the trailer sits in the school's front parking lot next to its main entrance, sometimes overnight, and once a week J.S. witnesses nearly his entire class march off to the trailer and then return a half hour later, the court overrules this objection.

**2.** The motion for a preliminary injunction sought to enjoin activities that plaintiff presumed were occurring at the time, such as her belief that ACHC's trailer was using school electricity. (*See* DE # 14 at 22.) Discovery has revealed that this belief was wrong. Her motion also sought to prevent the school from participating in or promoting ACHC's program in various ways. (*Id.*) Because defendant has avowed to no longer give ACHC differential treatment in contrast with other outside organizations, and ACHC does not use Horace Mann's electricity (DE # 46 at 2–4), these portions of the injunction motion are now moot.

which was granted leave to file an amicus brief (DE # 28; DE # 33). Defendant then moved to dismiss the case, arguing that plaintiff had no standing to challenge its time release program. (DE # 32.) After this motion was fully briefed (DE # 43; DE # 47) and the parties presented a list of stipulated facts (DE # 46), the magistrate judge held a hearing on the motions, where both sides made legal arguments (DE # 48).

Magistrate Judge Cosbey then issued his report and recommendation, asserting that this court should deny defendant's motion to dismiss and grant plaintiff's motion for a preliminary injunction. (DE # 50). Defendant timely filed its objections to the report and recommendation (DE # 52; DE # 53), and plaintiff responded to those objections (DE # 54).

## II. STANDARD OF REVIEW

When a party objects to a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report ... or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The district court has discretion to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*; FED. R. CIV. P. 72(b). As defendant appears to object to all of the core legal conclusions made by the report and recommendation (*see* DE # 52), the court will review Magistrate Judge Cosbey's report de novo. *See* 28 U.S.C. § 636(b)(1)(C).

## III. DEFENDANT'S MOTION TO DISMISS: STANDING

Magistrate Judge Cosbey recommended that this court hold that plaintiff has standing to bring this suit, and thus deny defendant's motion to dismiss the case for

lack of standing. (DE # 50 at 9–15.) In his analysis of the issue, he begins by reviewing contemporary law dealing with standing in Establishment law cases (*id.* at 869–71), before asserting that the standing issue "seemingly begins and ends with [*McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948)] and [*Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952)]," two cases challenging religious time release programs where the Supreme Court found parents had standing. (DE # 50 at 13.) In support of this conclusion, Magistrate Judge Cosbey also analogizes this case to some additional Establishment Clause cases where courts found plaintiffs had standing.[3] (*Id.* at 871–73.)

▪ Defendant objects, contending that *McCollum* and *Zorach* make only "a passing reference to the issue of standing." (DE # 53 at 4–5.) Further, defendant asserts that plaintiff has failed to meet its burden of showing "ongoing and irreparable injury," and contrasts plaintiff and J.S.'s viewing of ACHC's trailer with cases where the plaintiffs viewed obviously religious paraphernalia. (*Id.* at 4–8.) Plaintiff responds that the injury alleged in *Zorach* was, by any measure, far weaker and less distinct than the injury she and her child allegedly suffer. (DE # 54 at 2–4.) She also appears to allege that having to regularly confront the fact that defendant allows religious instruction to take place on school property during school hours, combined with the fact that Indiana law requires J.S. to attend the school, is the injury at issue, not viewing religious imagery or symbols. (*Id.* at 4.) Plaintiff has the burden of establishing standing. *Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir.2001).

---

3. In summarizing Magistrate Judge Cosbey's reasoning, the court fails to do justice to the extensive research and analysis the report and recommendation contains.

## A. Applicability of McCollum and Zorach

To begin, the core of defendant's objection challenges the validity of the Supreme Court's holdings on standing in *McCollum* and *Zorach*. Defendant rightly notes that the court's language dealing with standing in those two cases is minimal. In *McCollum*, the court merely states, at the beginning of its opinion, that "[a] second ground for the [school board's] motion to dismiss is that the appellant lacks standing to maintain the action, a ground which is also without merit." *McCollum*, 333 U.S. at 206, 68 S.Ct. 461 (citing *Coleman v. Miller*, 307 U.S. 433, 443, 445, 464, 59 S.Ct. 972, 83 L.Ed. 1385 (1939)). In *Zorach*, the court limited its discussion of the issue to a footnote, stating: "No problem of this Court's jurisdiction is posed in this case since, unlike the appellants in *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 [ (1952) ], appellants here are parents of children currently attending schools subject to the released time program." *Zorach*, 343 U.S. at 309–10 n. 4, 72 S.Ct. 679. Obviously, these cases provide little analysis of this issue, and fail to even relate the standards they rely on to make their determinations.

*Zorach*'s citation to *Doremus* provides a lead though. *Doremus* dealt with a challenge of a New Jersey law requiring the reading of five bible verses at the start of each day in the state's public schools. *Doremus*, 342 U.S. at 430–31, 72 S.Ct. 394. One of the *Doremus* plaintiffs had a daughter in an affected high school, but because the daughter had graduated before the case was in front of the Supreme Court, the Court dismissed the appeal. *Id.* at 431–35, 72 S.Ct. 394. In doing so, the court laid out a legal standard for standing:

we reiterate what the Court said of a federal statute as equally true when a state Act is assailed: "The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in [s]ome indefinite way in common with people generally."

*Id.* at 434, 72 S.Ct. 394 (quoting *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)).

This language closely resembles the "injury in fact" portion of the contemporary test for standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (standing requires showing an injury in fact, that the injury must be fairly traceable to the defendant's action, and that the injury must be likely to be redressed by a favorable decision), which is the only portion of the standing requirement that defendant contests (*see* DE # 50 at 10) ("the entire issue of standing turns on whether [plaintiff] can show that an 'injury in fact' has occurred"). *Lujan* does further define "injury in fact" as requiring "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560, 112 S.Ct. 2130 (internal quotations and citations omitted). So the standard the Court apparently considered in *Zorach* was not completely up-to-date. But the fact that *Zorach* cited to a case—*Doremus*—that provided a standing doctrine, including a requirement of an injury in fact, that is similar to the modern test supports *Zorach*'s continued validity in regard to standing.

As does the fact that *Zorach* has continued to be cited for propositions relating to standing in parents' challenges to school policies. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 551, 106 S.Ct.

1326, 89 L.Ed.2d 501 (1986) (citing *Zorach* in Establishment Clause challenge for proposition that "As this Court has repeatedly held, parents have standing to challenge conditions in public schools that their children attend."); *Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 795 (9th Cir.1999) (citing *Zorach* in Establishment Clause challenge for premise that "Parents have a right to direct the religious upbringing of their children and, on that basis, have standing to protect their right."); *Boster v. Philpot,* 645 F.Supp. 798, 807 (D.Kan.1986) (citing *Zorach* for premise that "The Supreme ·Court has repeatedly held that parents have standing to challenge the conditions in public schools. their children attend."); *Northwestern Sch. Dist. v. Pittenger,* 397 F.Supp. 975, 980 (W.D.Pa.1975) (citing *Zorach* as one example of the "several cases involving challenges to various state laws under the establishment clause of the First Amendment, [where] the Supreme Court has.held that parents of children presently attending schools affected by the laws in question had standing to raise the constitutional claim"); *Lee v. Nyquist,* 318 F.Supp. 710, 716 (W.D.N.Y.1970) (citing *Zorach* and noting existence of standing in case where parents challenged law affecting racial demographics of schools); *see also Scenic Hudson Pres. Conference v. Fed. Power Comm'n,* 354 F.2d 608, 615 (2d Cir.1965) (citing *Zorach* as an example where "the Supreme Court has not made economic injury a prerequisite where the plaintiffs have shown a direct personal interest").

The standard relied on in *McCollum* is not as easily discernable, as its holding on standing only cited to *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), a case that dealt with an intra-governmental lawsuit between Kansas state legislators. *See McCollum,* 333 U.S. at 206, 68 S.Ct. 461 (citing *Coleman,* 307 U.S. at 443, 445, 464, 59 S.Ct. 972). But

what is clear is that, similar to *Zorach, McCollum*'s holding on standing has been repeatedly cited in cases challenging public school policies. For example, in *School District v. Schempp,* 374 U.S. 203, 224–25, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), a case challenging state laws requiring the reading of religious material at the start of every school day, the Supreme Court noted the following:

> It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain. But the requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include · proof that particular religious freedoms are infringed ... The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain. *Cf. McCollum v. Board of Education, supra.*

*Schempp,* 374 U.S. at 224–25 n. 9, 83 S.Ct. 1560 (internal citations omitted).

This reasoning is reflected in *Doe v. School Board of Ouachita Parish,* 274 F.3d 289 (5th Cir.2001), a post-*Lujan* Establishment Clause case that addressed the issue of standing. In ruling that parents and their children had standing to challenge a, Louisiana law allowing a period of prayer or meditation at the start of each school day, the Fifth Circuit cited *McCollum* in support of its statement that "the Supreme Court has repeatedly recognized the right of children and their parents to receive public education that is compliant with the Establishment Clause." *Ouachita Parish,* 274 F.3d at 292 (citing *McCollum,* 333 U.S. at 206, 68 S.Ct. 461).

Another somewhat recent decision, *Doe v. Porter,* 188 F.Supp.2d 904 (E.D.Tenn.

2002), relied on *McCollum* in a similar way. In that case, the court cited *McCollum* in support of its statement that because the plaintiffs "have two minor children who currently attend elementary school in the ... public school system [this] is sufficient to give [plaintiffs] and their children standing to bring" an Establishment Clause challenge. *Porter,* 188 F.Supp.2d at 908. *Porter* presented facts far more severe than those alleged here— holding bible ministry classes on campus without parental consent or telling parents or students the classes were optional—but that court also noted that: "[i]t is well settled that public school students and their parents have standing to maintain a federal lawsuit challenging the constitutionality of a State law, regulation, or program adopted by public school authorities under the Establishment Clause without proving that particular religious freedoms are being infringed." *Id.* at 907–08 (citing cases).

Other Establishment Clause challenges have also relied upon *McCollum* in determining that various plaintiffs showed standing. *See Fleischfresser v. Dir. of Sch. Dist. 200,* 15 F.3d 680, 683–84 (7th Cir.1994) (citing *McCollum* and noting "Courts have recognized that parents have standing as a result of their right to direct the religious training of their children."); *Roberts v. Madigan,* 921 F.2d 1047, 1051 (10th Cir.1990) (*McCollum* "supports the notion that students and their parents may challenge unconstitutional actions in the public schools that directly affect the students"); *Herdahl v. Pontotoc County Sch. Dist.,* 887 F.Supp. 902, 904 n. 1 (N.D.Miss. 1995) (citing *McCollum* and rejecting argument that parent lacked standing to challenge school policy allowing student groups to conduct and broadcast prayers, even when child was excused from participating); *Crockett v. Sorenson,* 568 F.Supp. 1422, 1424–25 (W.D.Va.1983) (parents of child in school that taught optional bible class had standing, citing *McCollum* ); *Goodwin v. Cross County Sch. Dist. No. 7,* 394 F.Supp. 417, 423 (E.D.Ark.1973) (citing *McCollum* and finding standing for parent in case challenging religious activities in school). Given this sizeable quantity of precedents relying on the standing holdings of *McCollum* and *Zorach,* the court is comfortable acting likewise. It thus rejects defendant's contention that "[n]o valuable insight, nor precedential value can be gained or gleaned from" these cases' holdings on standing.

## B. Standing Analysis

■ Defendant's objection assumes that *McCollum* and *Zorach* are inapplicable, and argues that plaintiff fails to show "ongoing and irreparable injury." (DE # 53 at 6–7) (citing *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 485–86, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).) While the court rejects this initial assumption, defendant's argument does highlight the fact that plaintiffs raising Establishment Clause challenges nearly always suffer an atypical, non-physical and non-financial injury. Given that, the court believes the most apt way to determine whether standing exists is to compare the injury alleged by plaintiff—that her child is legally obligated to attend a school that permits private religious instruction of students on a trailer on school grounds during the school day—to other Establishment Clause cases.

The magistrate judge's conclusion that standing exists derived from his comparison of this case to *McCollum* and *Zorach.* And indeed, those comparisons strongly support plaintiff's contention. *McCollum* dealt with a challenge to the Champaign, Illinois school district's policy of allowing outside religious groups to come into school during regular school hours, and

"substitute their religious teaching for the secular education" required by state law. *McCollum*, 333 U.S. at 205, 68 S.Ct. 461. The school district did not pay these religious teachers, and students were only allowed to attend these classes if their parents had requested such instruction in writing. *Id.* at 208–09, 68 S.Ct. 461. Students who did not participate "were required to leave their classrooms and go to some other place in the school building." *Id.*

In the court's view, the facts of *McCollum* compare closely to those here, with the main difference being that ACHC's religious teachers do not use defendant's school classrooms, but rather bring their own mobile classroom onto school property. Another, perhaps unimportant, contrast is that ACHC is the only organization providing religious instruction in the school district, while in *McCollum* "three separate religious groups" taught the classes. *McCollum*, 333 U.S. at 208–09, 68 S.Ct. 461. Like here, the non-participating students in *McCollum* did not appear to encounter any religious symbols or imagery because of the programs. Thus, the court views the injury in *McCollum* as similar to that alleged by plaintiff.

*Zorach*, as noted by plaintiff, offers an even stronger comparison in her favor. (*See* DE # 54 at 3–4.) In *Zorach*, the court found standing to exist, despite the fact that New York City's program merely allowed its public schools "to release students during the school day so that they may leave the school buildings and school grounds and go to religious centers for religious instruction or devotional exercises." *Zorach*, 343 U.S. at 308, 72 S.Ct. 679. Again, the public schools required a written request from parents before releasing their children, and students were free not to participate and remain in class. *Id.* By any measure, the injury in this case is more severe than that in *Zorach*, where

the religious instruction took place completely off of school property. *Cf. Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 282–85 (5th Cir.1999) (parents and school-children had standing to challenge program where clergy were brought into school to provide counseling, even though small minority of students were chosen to participate, students could decline, and plaintiffs' children had yet to be selected).

Other cases noted by the magistrate judge or defendant also offer favorable comparisons for plaintiff. In *Doe v. Crestwood*, 917 F.2d 1476 (7th Cir.1990), the plaintiff challenged a decision by a municipal festival to allow a Catholic mass service to be held in a tent that would normally be used as a beer garden. *Id.* at 1478. The court stated that the plaintiff "had standing" as he would stay away from the festival while the mass was happening, and, but for the mass, the tent would have been used as a beer garden. *Id.* Though the issue of standing does not appear to have been litigated in that case, apparently the plaintiff's avoidance of the mass, conducted in an area where he, presumably, could otherwise be enjoying a beer was enough to establish an injury in fact. Here, as noted by Magistrate Judge Cosbey, plaintiff's child is required to attend defendant's school by Indiana state law, contrasting with the plaintiff in *Doe* whose attendance at the festival was completely voluntary. Also, J.S. witnesses the effect of ACHC's program every week, when its trailer parks in the school parking lot and nearly all of his classmates go to participate. This is much more of an "ongoing" injury (*see* DE # 53 at 6), than the one festival mass described in *Doe*.

While the issue in *Books v. City of Elkhart*, 235 F.3d 292 (7th Cir.2000), differs sharply from this case—the plaintiffs there challenged the display of a Ten Commandments monument on the grounds of a mu-

nicipal building—the *Books* court found standing because the plaintiffs had to come into "direct and unwelcome contact with the religious display" to fulfill their legal and civic duties. *Id.* at 300. The court also noted that because the plaintiffs knew what was written on the monument, "merely walking behind it" and not looking at the words "will not eradicate the injury they allegedly suffered" by passing it. *Id.* at 300–01. From this court's perspective, this analysis rebuts defendant's claim that ACHC's trailer is inoffensive, even if plaintiff and her child have to encounter it when they are legally required to attend J.S.'s school, because the trailer's outside has no visible religious imagery. (*See* DE # 53 at 7.) Like the plaintiffs in *Books* who were "aware of the words" on the monument, plaintiff and J.S. are equally aware that his classmates receive religious instruction during school hours on school property within ACHC's trailer.[4]

Finally, the court has difficulty seeing how the injury alleged here can be any less severe than those alleged in several of the cases challenging "moment of silence" type laws in various states. For example, in *Ouachita Parish,* Louisiana passed a law allowing school districts to set aside a time for students to pray or meditate at the start of school days. *Ouachita Parish,* 274 F.3d at 290–91. Certainly it could be argued that sitting in class for a moment while classmates meditate or pray does little to injure a student, at least in the traditional sense of the word, especially since public school students are not prohibited from voluntarily praying during the school day. *See Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 313, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) ("nothing in the Constitution interpreted by this Court prohibits any public school student from voluntarily praying at any time before, during, or after the school day"). But the Fifth Circuit held that the plaintiff in *Ouachita Parish* had standing, noting that "[i]mpairments to constitutional rights are generally deemed adequate to support a finding of 'injury' for the purposes of standing" and that "[t]he case is made stronger when the plaintiffs are ... parents of students attending public schools, and thus are not merely 'concerned bystanders.'" *Ouachita Parish,* 274 F.3d at 292 (citing and quoting cases). Similarly, a court in the Northern District of Illinois has recently rejected a standing argument in a case that claims Illinois's moment of silence law violates the Establishment Clause. *See Sherman v. Twp. High Sch. Dist. 214,* 540 F.Supp.2d 985, 990–91 (N.D.Ill.2008). Notably, the defendants in that case were represented by the same organization that filed ACHC's amicus brief in this case, and the description of the arguments made in that case sounds quite similar to the objections defendant now raises. *See id.* at 989–90; (*see* DE # 34; DE # 53 at 4–7.)

In sum, the court believes the vast weight of applicable precedent indicates that plaintiff has carried her burden of establishing standing. It therefore overrules defendant's objections to the first portion of the report and recommendation, and will deny defendant's motion to dismiss.

## IV. PRELIMINARY INJUNCTION

### A. Background

In his report and recommendation, Magistrate Judge Cosbey recommended that this court grant the motion for a preliminary injunction filed by plaintiff. (DE

---

4. J.S. is especially aware of this, as ACHC took him into its trailer without plaintiff's permission, and gave him a promotional pamphlet (DE # 46 at 3–4; DE # 50 at 6–7)—an event that defendant avers will not happen with any future schoolchildren.

#50 at 15–30.) Specifically, the magistrate judge believed that plaintiff had shown she and her child suffer irreparable harm, and that she is likely to succeed on the merits. (*Id.*)

Defendant objects to both of these core conclusions. First, defendant contends that plaintiff has merely alleged irreparable harm, not shown such harm. (DE #53 at 8–9.) Second, defendant argues that plaintiff is not likely to succeed on the merits. (*Id.* at 9–16.) Specifically, defendant contests the magistrate judge's conclusion that this case is closer to the facts of *McCollum* than *Zorach*. (*Id.* at 9–11.) It also asserts that its policy, allowing ACHC to bring its classroom trailer onto school property, serves secular purposes— meeting parental and "associational" desires, and ensuring student safety. (*Id.* at 11–13.) Further, the policy does not have the effect of endorsing religion, because the ACHC's trailer does not display any visible religious symbols or imagery. (*Id.* at 13–15.) Finally, defendant asserts that its program will suffer "irreparable harm" that outweighs any potential harm to plaintiff because relocating the ACHC trailers would increase the safety risk to students, potentially force the school to expand the time it sets aside for the program, and upset the parents who support the program. (*Id.* at 15–16.)

Plaintiff counters that case law supports her claim of irreparable harm. (DE #54 at 5.) She also contends that the key fact in this case, that defendant allows ACHC to conduct its program on school property, makes this case far more similar to *McCollum* than *Zorach*. (*Id.*) Regarding her likelihood of success on the merits, she argues that there is no secular purpose for allowing ACHC to run its program on school grounds, that the fact that ACHC is actually teaching elementary school students religious material on school property during school hours clearly conveys a mes-sage of endorsement by defendant, and that the school corporation itself will not suffer any harm if the injunction is granted. (DE #5–9.)

### B. Standards and Applicable Case Law

 Plaintiff has moved for a preliminary injunction enjoining defendant from allowing ACHC to park its trailer on school grounds during school hours for the purpose of religious instruction, as part of defendant's time release program. (DE #13.) In determining whether a situation merits a preliminary injunction, a district court conducts a two phase analysis. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1085–86 (7th Cir.2008) First, the threshold phase requires a party seeking the injunction to satisfy three requirements: (1) "that absent a preliminary injunction, it will suffer irreparable harm in the interim," (2) "that traditional legal remedies would be inadequate," and (3) "that its claim has some likelihood of succeeding on the merits." *Id.* at 1086 (citing *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir.2001)). If the moving party passes this threshold phase, the court conducts a balancing analysis. *Id.*

In this second phase, the court, in an attempt to minimize the cost of potential error, *see Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.,* 780 F.2d 589, 593–94 (7th Cir.1986), "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest,'" [*Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir.1986).] Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irrepara-

ble harm the nonmoving party would suffer if the court were to grant the requested relief. [*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992).] In so doing, the court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." [*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)]; *see also Ty*, 237 F.3d at 895; *Abbott Labs.*, 971 F.2d at 12. Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest"). *Ty*, 237 F.3d at 895; *Roland Mach.*, 749 F.2d at 388. Taking into account all these considerations, the district court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Lawson Prods.*, 782 F.2d at 1436.

*Girl Scouts of Manitou Council*, 549 F.3d at 1086.

Unlike the standing issue, the parties here have no dispute over the controlling precedents that govern this case. Both appear to agree that it is proper to compare the Supreme Court's "time release program" precedents of *McCollum* and *Zorach* to this case. Both also agree that the test put forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), is applicable. The court will thus consider both of these frameworks in determining whether to accept Magistrate Judge Cosbey's recommendation.

■■■■ Under the *Lemon* test, "government action does not violate the First Amendment's ban on the establishment of religion if it has a secular purpose, if its principal or primary effect is one that neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion." *Books v. Elkhart County, Ind.*, 401 F.3d 857, 862 (7th Cir.2005) (*Books II*) (citing *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105; *County of Allegheny v. ACLU*, 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). The "effect prong" of this test is reviewed under a "perception of endorsement" test, where the court determines "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); *see Freedom from Religion Found., Inc. v. City of Marshfield, Wis.*, 203 F.3d 487, 493 (7th Cir. 2000). "When [the court] find[s] that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is favored or preferred, the Establishment Clause has been violated." *Freedom from Religion Found.*, 203 F.3d at 493.

### C. Threshold Phase

■■■■ The magistrate judge concluded that plaintiff satisfied the three portions of the threshold test for a preliminary injunction. (DE # 50 at 17–31.) Defendant objects to two portions of that conclusion—arguing that plaintiff fails to show irreparable harm or that she is likely to prevail on the merits. (DE # 53 at 8.) Regarding irreparable harm, defendant's argument is somewhat circular. It concedes that a First Amendment violation, even for a short period of time, is "unquestionably irreparable injury." (DE # 53 at 8.) But it contends that "a mere allegation" cannot establish irreparable injury, citing to *Doe by Doe v. Shenandoah County School Board.*, 737 F.Supp. 913, 916 (W.D.Va.1990). (*Id.* at 8–9.)

After reviewing *Shenandoah,* the court determines that defendant's citation to it is disingenuous. The court there was simply indicating that a party with completely unfounded or irrelevant allegations would not have shown an irreparable injury, and thus determining whether there was such injury required the court to "make some investigation into the plaintiff's likelihood of success." *Shenandoah,* 737 F.Supp. at 916. Thus, the court there was merely noting how the various portions of the threshold phase were interwoven. It did *not* hold that a plaintiff needs some formal judgment that she has experienced a First Amendment violation to get past the threshold phase, as defendant suggests. Indeed, were that the case, no plaintiff alleging an Establishment Clause violation could ever get past the threshold phase, because in order to do so they would first need some preemptive legal ruling that their rights had been violated. The court rejects defendant's frivolous argument.

 Defendant also argues that plaintiff does not meet the threshold phase's requirement that she show "some likelihood of succeeding on the merits." Notably, defendant fails to note the modifier "some" when making this objection. (*See* DE # 53 at 8.) Given that the time release program in *Zorach* (held completely off school grounds) was found to be constitutional, and the program in *McCollum* (held on school property) was not, this precedent alone could be enough to show "some" likelihood of success. Combined with the fact that, as the magistrate judge noted, several time release cases have emphasized the importance of the location of the religious instruction, (*see* DE # 50 at 23–24), then plaintiff has certainly shown "some likelihood" of succeeding on the merits. Accordingly, the court overrules defendant's objections to the magistrate judge's analysis of the threshold phase. The court holds that plaintiff has satisfied the threshold phase, and will thus proceed to the balancing phase.

### D. Balancing Phase: McCollum and Zorach

After comparing this case to *McCollum* and *Zorach* and applying the *Lemon* test, Magistrate Judge Cosbey concluded that plaintiffs were likely to succeed on the merits of their claim. Defendant objects to the outcome of both these analyses.

First, defendant asserts that this case is closer to *Zorach* than *McCollum,* because the school in *McCollum* had "close cooperation" with the outside religious groups teaching in its classrooms; the program in *Zorach* had no such cooperation. (DE # 53 at 9–10.) Plaintiff does not allege that defendant has close cooperation with ACHC, and indeed repeatedly states that its challenge rests on the basic facts that defendant allows religious instruction on school grounds during the school day. (DE # 54 at 5.) Thus, plaintiff essentially argues that defendant's lack of close cooperation doesn't matter.

The court is persuaded by Magistrate Judge Cosbey's excellent analysis of this issue, noting that *McCollum*'s core principle prohibited "the use of tax-supported property for religious instruction" and "the utilization of tax-established and tax supported public school system to aid religious groups to spread their faith." *McCollum,* 333 U.S. at 209–10, 68 S.Ct. 461; (DE # 50 at 22–23.) Further, defendant offers no rebuttal to the cases the report and recommendation cites, all of which note the importance of where a religious instruction program is located. (DE # 50 at 23–24.) Indeed, as Magistrate Judge Cosbey stresses (*id.* at 877), while courts have upheld religious time release programs held off of school grounds, *see Zorach,* 343 U.S. 306, 72 S.Ct. 679; *Pierce ex rel.*

*Pierce v. Sullivan W. Cent. Sch. Dist.,* 379 F.3d 56, 60 (2nd Cir.2004) (upholding an off site time release program); *Smith v. Smith,* 523 F.2d 121 123–24 (4th Cir.1975) (upholding a released time program and distinguishing it from *McCollum* because it took place off school grounds), defendant cannot point to a program conducted on school property that has been held to be constitutional. Accordingly, the court agrees that the comparison of *McCollum* and *Zorach* with this case supports plaintiff's contention that she is likely to succeed on the merits of her case.

### E. Balancing Phase: The Lemon Test

Regarding the *Lemon* Test, Magistrate Judge Cosbey concluded that defendant's program failed to survive any of the three prongs, especially the secular purpose and effect portions. (DE # 50 at 24–28.) Defendant objects to that conclusion in its entirety, and contends that its program passes the *Lemon* test.

First, defendant argues that allowing ACHC to teach its religious classes on school property satisfies the first portion of the *Lemon* test because it has a secular purpose, namely "accommodating parental desires," (DE # 53 at 11), and also notes that it satisfies a need to increase "student safety" (*id.* at 871–72). In addition, defendant argues, without citation to authority, that preventing "ACHC from coming onto its property" could violate the First Amendment's Free Exercise Clause, and claims that it is "remaining neutral" and acting with its own policies that allow outside groups to use school grounds. (*Id.* at 12–13.) Plaintiff responds that there is "simply no valid safety reason for allowing the religious instruction to take place on school grounds," and notes that the school's responsibility under Indiana law is to merely release students from school. (DE # 54 at 5–6.) Thus, safely transporting the students safely to and from the religious class is ACHC's concern, not defendant's. (*Id.* at 6.)

The governmental entity has the burden of proving a secular purpose under the *Lemon* test, *Books,* 235 F.3d at 304 n. 8, though courts will defer to the government's stated purpose as long as it is not a "sham." *Books II,* 401 F.3d at 863. "The Supreme Court has held that government action lacks a valid secular purpose under *Lemon* only when there is no question that the statute or activity was motivated wholly by religious considerations." *Id.* (internal quotation marks and citation omitted).

To begin, the court agrees that "accommodating parental desires" to have a religious time release program is not a reason to allow ACHC to conduct its classes on school property. There has been no evidence presented that parents specifically requested a program that occurred on school grounds, as opposed to somewhere nearby, as in *Zorach.* And defendant sets up a straw man in claiming that preventing ACHC from coming onto school property might violate the Free Exercise Clause. Allowing ACHC to merely come onto school property—to, for example, pick up students—is not the question. Instead, defendant allows ACHC to set up shop in the school parking lot and provide religious instruction to children during the school day.

However, the issue is closer with defendant's contention that its allowing the ACHC trailers on campus is designed to insure student safety. Plaintiff and the magistrate judge both note the school has no legal obligation to ensure the safety of students when they leave for the time release program. (DE # 50 at 26; DE # 54 at 6.) However, not having a legal obligation in such matters does not mean that defendant and its schools do not have a very strong interest in keeping students safe off campus. Certainly, any reasonable school administration has such an interest. That is in part why schools teach

CPR and First Aid, why school districts employ crossing guards, and why teachers and school administrators must report suspicions of child abuse to the authorities. *See* IND.CODE §§ 31–33–5–1; 31–33–5–2.

Magistrate Judge Cosbey notes that "the school apparently sees its role as overseer of school safety as ending ... when the children exit the school building" and are met by ACHC's teachers. (DE # 50 at 26.) But defendant explains that it does not escort the students further "to avoid excessive entanglement with the program" (DE # 53 at 13), and the court does not see how not taking the students directly to the doors of the trailer shows a lack of concern for student safety. After all, nothing prevents defendant's teachers from watching the students walk to the trailer from the doors of the school. While the court appreciates the magistrate judge's point that the school "apparently knows little or nothing about the ACHC teachers" (DE # 50 at 26), it does not believe that this translates into an inconsistent concern for student safety. After all, ACHC has been conducting religious time release classes since the 1960s (DE # 46 at 2) apparently without complaint, so there is at least an inference that students have not been physically endangered during such classes.

Furthermore, the school's property is bound by one side on a river and on another side by a busy road. (*Id.* at 5–6.) Since the school seems to have a large parking lot in front of it, it makes sense that defendant would wish to avoid exposing children to those potential hazards by allowing the trailer on campus. Given the evidence, the court believes that defendant's concern for student safety is not "a sham," or at the very least that there is some question whether its decision to allow ACHC's trailer to sit in the school's parking lot is "motivated wholly by religious considerations." *Books II*, 401 F.3d at

863. Thus, the court holds that defendant passes the first leg of the *Lemon* test.

However, the court strongly agrees with the magistrate judge that defendant fails to survive *Lemon*'s "effects test." In this portion of the *Lemon* test, the court must determine whether allowing ACHC to conduct religious instruction on school property during school hours conveys a "message of endorsement or disapproval." *Freedom from Religion Found.*, 203 F.3d at 493 (internal quotation and citation omitted). When the court finds "that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored or preferred*, the Establishment Clause has been violated." *Id.* (emphasis in original).

■ Here, the court has no doubt that a reasonable observer would perceive that religion, and specifically the variety of Christianity practiced by ACHC, is "favored or preferred" by defendant. Defendant argues that since the trailers lack any religious markings, a reasonable observer would not know religious instruction takes place inside them. (DE # 53 at 13–15.) As the magistrate judge noted (DE # 50 at 27), the reasonable observer in this inquiry must be aware of the history, context and forum where the religious activity is taking place. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (citing cases). Such a reasonable observer would know that defendant allows religious instruction to take place on school property during the school day, would see the ACHC trailer physically connected to the school (by way of an extension cord), and would notice that it parks in plain sight right next to the main entrance of the school, and is visible to children on one of the school's playgrounds. Further, the fact that the trailers are devoid of religious markings could be seen as increasing the perception

of endorsement, as the trailer may blend in with other school buildings and vehicles. In sum, the court firmly agrees with the magistrate judge's conclusion that allowing the ACHC to locate its trailer in defendant's parking lot, and thus conduct religious instruction of public school students on school grounds during school hours, conveys a message of support and endorsement. Thus, this court concludes that defendant flatly fails to survive the second prong of the *Lemon* test.[5]

Defendant's failure to survive the *Lemon* test, combined with the court's agreement that this case more closely resembles *McCollum* rather than *Zorach*, convince the court that plaintiff's chances of prevailing at trial are quite strong. Thus, the court agrees with the report and recommendation in this respect (*see* DE # 50 at 28), and will overrule defendant's objections on this point.

### F. Balancing Phase: Balance of Harms

This court now turns to the "balance of harms" consideration. *See Girl Scouts of Manitou Council*, 549 F.3d at 1086. This analysis relies on a "sliding scale" approach, where the more likely a plaintiff is to win, "the less heavily need the balance of harms weigh in his favor." *Id.* (quoting *Roland Mach. Co.*, 749 F.2d at 387). As the court believes that plaintiff is quite likely to succeed on the merits, the court begins this analysis with plaintiff needing to carry less of a burden than if her chances of success were poor or merely average. *See id.*

The magistrate judge determined that the balance of harms favored plaintiff. (DE # 50 at 29–30.) In its objection, defendant argues that its program "will suffer irreparable harm" if it is enjoined from allowing ACHC to locate its trailers on school grounds, as it would subject students to "possible danger" and "logistical complications." (DE # 53 at 15.) Defendant claims that relocating the trailers might force it to increase the time allotted for the program, thus reducing "secular education time." (*Id.* at 15–16.) Further, the public interest would be harmed, as the program is "popular." (*Id.* at 16.) Plaintiff responds that any First Amendment injury is "unquestionably irreparable harm", and that defendant would not be harmed by the removal of the program, as it does not run the program, but rather merely releases the students. (DE # 54 at 7–8.)

Given the starting point of this analysis, the court agrees with Magistrate Judge Cosbey that the balance of harms favors plaintiff. As courts have repeatedly recognized, the violation of a party's First Amendment rights is irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Nebraska Press Ass'n v. Stuart*, 423 U.S. 1327, 1329, 96 S.Ct. 251, 46 L.Ed.2d 237 (1975) ("any First Amendment infringement that occurs with each passing day is irreparable"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir.2006) ("[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate").

In contrast, the harm to defendant itself is slight. Regarding the "harm" of endangering student safety, the court does not

---

**5.** The report and recommendation rested its conclusion that defendant failed the *Lemon* test on its first two prongs, and failed to address the third. As this court is convinced that defendant fails the *Lemon* test's second prong, and the parties make no arguments about the third prong, the court chooses not to address it here.

find this point persuasive. Students leave and arrive at school on their own power every day. The court does not understand how the risk to student safety will increase dramatically if students board buses, for example, and are driven a few minutes away, instead of walking directly to a trailer. The only legitimate concern defendant raises on its own behalf is the logistical and educational inconvenience of increasing the time students are released from their regular classes, to account for longer travel times. But a school having to budget a few extra minutes a week surely does not outweigh the "irreparable" harm of a First Amendment violation.

 The only remaining factor to consider is the harm accorded to the public interest. *See Girl Scouts of Manitou Council,* 549 F.3d at 1086. Defendant argues that parents who support the program would be harmed (DE # 53 at 16), and ACHC has argued in its amicus brief that it would have to end its program (DE # 34 at 28–29), as no suitable local sites are available (DE # 46 at 6).[6] But this potential harm is mitigated, if not totally outweighed, by the fact that "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y,* 453 F.3d at 859. Magistrate Judge Cosbey noted this holding in his report and recommendation, and defendant's objection provides no reason to disregard this precedent. Thus, the court believes the harm to the public interest also weighs in plaintiff's favor—the local community may be harmed if the program ends (although it may just become more expensive and time-consuming to operate), but the public has a strong and established interest in protecting First Amendment rights. Taken with the fact that defendant

suffers little harm, and plaintiff suffers "irreparable injury," the balance of harms weigh firmly in favor of plaintiff.

In conclusion, this court determines that plaintiff has satisfied the standards for a preliminary injunction. It therefore will accept the report and recommendation of the magistrate judge on this issue, and overrule defendant's objections.

## V. CONCLUSION

For the reason explained above, this court **ACCEPTS** the report and recommendation of Magistrate Judge Cosbey (DE # 50). The court therefore **DENIES** defendant's motion to dismiss (DE # 32), and **GRANTS IN PART** and **DENIES IN PART AS MOOT** plaintiff's motion for a preliminary injunction (DE # 13). As Magistrate Judge Cosbey has already held the preliminary injunction hearing (*see* DE # 48), plaintiff's motion to consolidate the preliminary injunction hearing with a trial on the merits (DE # 36) is **DENIED AS MOOT.**

Accordingly, defendant Huntington County Community School Corporation is hereby **ENJOINED** from allowing religious instruction to occur on its property during school instructional time. As plaintiff is not seeking monetary damages, and defendant has neither alleged that it will suffer any financial harm if an injunction is issued nor requested that any amount be placed in security, the court will not require a preliminary injunction bond. *See* Fed. R. Civ. P. 65(c); *Doctor's Assoc., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996) (preliminary injunction bond not mandatory); *Scherr v. Volpe,* 466 F.2d 1027, 1035 (7th Cir.1972) (amount of bond rests within discretion of the district court).

**SO ORDERED.**

---

6. The court accepts this conclusion, as the parties stipulated to it, but finds it a bit hard to believe, given that the program apparently enjoys broad support in the community, ACHC's trailer is small enough to be hauled from school to school, and J.S.'s school is located in a rural area.

*REPORT AND RECOMMENDATION*

ROGER B. COSBEY, United States Magistrate Judge.

There are two issues at the center of this declaratory judgment action: (1) does a school corporation violate the First Amendment's Establishment Clause when it permits a church association to present a released time program of religious instruction to third and fourth grade students in a mobile classroom on school grounds during school hours; and (2) does a third grade child in the school, but who is not released to that class, or his parent, have standing to challenge and enjoin that activity?

After considering the briefs and arguments of counsel at a hearing on January 21, 2009, it is recommended that at this juncture the District Court answer both questions affirmatively and enter a preliminary injunction.[1]

## I. INTRODUCTION

H.S. is the parent of J. S., a third grade student at Horace Mann Elementary School ("Horace Mann"), and both have sued Huntington County Community School Corporation ("the School Corporation"), for declaratory and injunctive relief to stop the School Corporation from "allowing a religious education program to engage in religious instruction of students during school hours in a trailer on school property" and from preventing any school employee's involvement in the program during school hours.[2] (Am. Verified Compl. for Declaratory and Injunctive Relief ("Am. Verified Compl.") 1.)

The present controversy involves two motions: (1) the motion for preliminary injunction filed by H.S. and J.S. (Docket # 13), which the School Corporation opposes (Docket # 26); and (2) the motion to dismiss filed by the School Corporation under Federal Rule of Civil Procedure 12(b)(1), which argues that H.S. and J.S. lack standing to bring this case. (*See* Docket # 32.)

In accordance with 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Northern District of Indiana Local Rule 72.1(d)(1)(A), (F), District Court Judge James T. Moody referred these matters to the undersigned Magistrate Judge for the issuance of a Report and Recommendation. (Docket ## 19, 38.) For the reasons provided in this Report and Recommendation, it is recommended that the motion for preliminary injunction be GRANTED, and the School Corporation's motion to dismiss be DENIED.[3]

## II. PROCEDURAL BACKGROUND

H.S. and J.S. commenced this case with the filing of a verified complaint, which was later amended, seeking a declaratory judgment. (Docket ## 1, 9.) What brings this matter before the Court now, however, is their motion for a preliminary injunction, and the contention that the School Corporation's released time program for religious education, as administered at Horace Mann, violates the Establishment Clause of the First Amendment to the United States Constitution.[4] (Docket ## 13, 14.)

---

1. No evidence was submitted at the January 21, 2009, hearing.

2. There is no evidence that any School Corporation employees are currently involved in the religious program at Horace Mann, and therefore counsel for the Plaintiffs indicated at the January 21, 2009, hearing that they are not presently pursuing injunctive relief on that issue.

3. The Court wishes to express its appreciation to counsel for the excellent briefs they, and the amicus, have submitted on these issues.

4. There are eight grade schools in the School Corporation's system (Shafer Dep. 2), but the

Also before the Court is the School Corporation's motion to dismiss, in which it argues that this Court does not have jurisdiction because H.S. lacks standing to pursue this case as a taxpayer (a point the Plaintiffs concede), and because there is no showing that either H.S. or J.S. have suffered any harm because of the released time program. (Def.'s Resp. Objecting to Pl.'s Mot. for Prelim. Inj. and in Supp. of Def.'s Mot. to Dismiss ("Def.'s Resp. Br.") 5–7.)

Concerning the merits, the School Corporation also maintains that there is no violation of the First Amendment here, and that since the Plaintiffs therefore cannot prevail, no injunctive relief should be granted either.[5] (Def.'s Resp. Br. 7–22.)

At the urging of the Court, the parties submitted stipulated facts (Docket # 46), which form the major part of the Federal Rule of Civil Procedure 52(a)(2) findings and conclusions submitted in Section III of this Report and Recommendation. The stipulated facts have been supplemented to the extent warranted in the record, and both they and the accompanying conclusions of law are set out in narrative fashion.

### III. FINDINGS OF FACT[6]

Indiana law provides that "[w]hen the parent of a student who is enrolled in a public school makes a written request, the principal may allow the student to attend a school for religious instruction that is conducted by ... an association of churches ...." Ind.Code § 20–33–2–19(a). Indiana law further provides that if a principal grants such permission, then she "shall specify a period or periods, not to exceed one hundred twenty (120) minutes in total in any week, for the student to receive religious instruction." Ind.Code § 20–33–2–19(b).

The law also requires that the religious instruction school maintain attendance records because the students who attend are to receive the same credit they normally would receive for attending public school. Ind.Code § 20–33–2–19(c); Ind.Code § 20–33–2–19(d).

In accordance with Indiana law, the School Corporation has a policy that allows the release of students from school so they can attend a religious instruction program of no more than 120 minutes per week.[7] (Stipulated Facts ¶ 3.) Throughout the entire School Corporation, the policy takes the form of a voluntary program of religious instruction for third and fourth grade students called "By the Book," offered by ACHC. (Stipulated Facts ¶ 5.) Every year since its inception in 1946, ACHC has offered released time religious education to elementary school students in the School Corporation, and the By the Book program in particular has been in effect in its present form since 1954. (Stipulated Facts ¶¶ 6, 22.) Approximately 97% of the School Corporation's third and

---

relief sought in the motion appears to be limited to the program at Horace Mann (*see* Mot. for Prelim. Inj. ¶ 2).

5. Associated Churches of Huntington County ("ACHC"), the entity who conducts the religious instruction at issue in this case, filed an Amicus Curiae brief on January 6, 2009 (Docket # 34), in support of the School Corporation's position. ACHC alleges that "if this Court grants Plaintiff's preliminary injunction motion, the Association's released-time program at Horace Mann Elementary School will cease to exist." (Mot. to File an Amicus Curiae Br. 2.)

6. Any finding of fact deemed to be a conclusion of law is incorporated as such, and any conclusion of law deemed a finding of fact is also incorporated as such.

7. There is no dispute that the School Corporation's policy, "Absences for Religious Instruction," complies with Indiana law. (Stipulated Facts ¶ 4.)

fourth graders participate in the By the Book program. (Stipulated Facts ¶ 23.)

With parental consent, students are released from school for approximately one-half hour per week to attend By the Book's presentations. (Stipulated Facts ¶ 7.) Since approximately the late 1960s, ACHC has provided the released time education program in trailers, self-described mobile classrooms (see Verified Compl. Ex. 1), located on School Corporation property at various elementary schools. (Stipulated Facts ¶ 24.) ACHC owns the mobile classroom trailers and hires its own teachers. (Stipulated Facts ¶ 8.)

At Horace Mann, the mobile classroom trailer is parked in the front parking lot, about fifty feet from the school's front entrance, and in a location where visitors to the school would park if the space was unoccupied. (See Jan. 21, 2009, Hr'g.) At oral argument it was noted, without apparent dispute, that the mobile classroom trailer is parked adjacent to Horace Mann's playground. (See Jan. 21, 2009, Hr'g.) The classroom trailers are unmarked and display no religious iconography. (See Jan. 21, 2009, Hr'g.; Verified Compl. Ex. 2.) ACHC's personnel move the mobile classroom trailers from school to school, and on occasion, they remain parked at a school overnight. (Stipulated Facts ¶ 9.) At times while on the lots, the classroom trailers are hooked up to electric utility connectors that ACHC installed. (Stipulated Facts ¶ 9.) ACHC pays for all utility expenses related to the program; the School Corporation does not dedicate any funds to the By the Book program or any other religious organization or program. (Stipulated Facts ¶¶ 9, 19.)

The School Corporation is also not involved in the By the Book program's curriculum. (Stipulated Facts ¶ 10.) The School Corporation does not set any educational guidelines for the released time program, nor does it have any say in its curriculum or in the selection or employment of its teachers. (Stipulated Facts ¶ 10.) The School Corporation only interfaces with the program when it comes to the custodial and logistical care of students and any information regarding the students' participation in the program. (Stipulated Facts ¶ 10.) In terms of custodial care of the students, it is the School Corporation's policy to escort participating students to the door of the school where they meet ACHC personnel, who then accompany them to the classroom trailer. (Stipulated Facts ¶ 18.)

Students who choose not to participate in the By The Book program remain in their regular classroom and do school-related work, such as completing assignments, reading, or they receive personal instruction. (Stipulated Facts ¶ 11.)

H.S. is the mother of an eight year old child, J.S., a third grade student at Horace Mann, one of the School Corporation's elementary schools. (Stipulated Facts ¶ 1.) J.S. is required by state compulsory attendance laws to attend this school. Ind. Code §§ 20–33–2–4; 20–33–2–5; 20–26–11–2. It is also undisputed that from time to time, H.S. must attend school functions there as the parent of J.S.

On September 11, 2008, J.S. and other third and fourth graders at Horace Mann were sent by their teachers, and without parental consent, to visit one of ACHC's mobile classroom trailers located in Horace Mann's parking lot. (Stipulated Facts ¶ 12; Jan. 21, 2009, Hr'g.) No religious instruction took place at that time; however, each child received a By the Book "Parent's Request Form" ("the Form"). (Stipulated Facts ¶ 12.)

The Form promotes By the Book's Christian-based educational program and contains a place for a parent to sign to allow a child's attendance. (See Verified Compl. Ex. 1.) The Form's cover depicts a

cartoon-style church character holding a Bible. (Verified Compl. Ex. 1.) The Form tells the reader that third grade participants "focus on how to use the Bible" and "go on a journey through the Old Testament by studying lives of several Biblical heroes." (Verified Compl. Ex. 1.) The Form then explains that participating fourth graders "become familiar with the New Testament" through lessons focusing upon "the life of Jesus." (Verified Compl. Ex. 1.) The Form also makes clear that the program's textbook is the Bible. (Verified Compl. Ex. 1.)

The Form relates that By the Book classes provide students with knowledge so they can apply Bible stories to daily life, know steadfast moral values based on Scripture, locate Scripture, know the value of prayer, know and follow Jesus, and know and keep the Ten Commandments. (Verified Compl. Ex. 1.) The Form also explains that classes meet weekly during the school year and during the school day in mobile classrooms near the school. (Verified Compl. Ex. 1.) As the Form notes, children who do not attend the program remain in their regular classroom or with school personnel. (Verified Compl. Ex. 1.)

On September 12, 2008, Amy Ashcraft, the principal at Horace Mann, received an e-mail from H.S., with concerns about the Form that J.S. received the day before. (Stipulated Facts ¶ 13.) H.S. objected to the program and inquired about what the non-participating students were doing while other children were released to the By the Book program. (Stipulated Facts ¶ 13.) Ms. Ashcraft promised a reply after inquiring of J.S.'s teacher. (Stipulated Facts ¶ 13.)

The next day, H.S. sent an email to the School Corporation's Superintendent, Tracy Shafer, regarding the same issue. (Stipulated Facts ¶ 14.) She advised that her son J.S. had been taken into the trailer used for Bible classes and given a "Christian promoting recruitment pamphlet" (i.e., the Form). (Stipulated Facts ¶ 14.) The Superintendent responded that he would look into the matter and respond.[8] (Stipulated Facts ¶ 14.)

Upon investigation, Mr. Shafer learned that J.S. and all of the third and fourth grade students at Horace Mann had indeed been taken to the mobile classroom by ACHC personnel and given the Form.[9] (Stipulated Facts ¶ 15.) In fact, prior to this lawsuit, the School Corporation's procedure or custom was to have the students go to the mobile classroom trailer to receive the Forms. (See Jan. 21, 2009, Hr'g.) The Superintendent also learned, however, that J.S.'s visit did not involve any discussion about religion, as no religious instruction occurs until the fourth meeting. (Stipulated Facts ¶ 15.)

The Superintendent recognized that the manner of disbursement of the Form, and the students' visit to the trailer without parental consent, was contrary to the School Corporation's policy. (Stipulated Facts ¶ 16.) He apologized to H.S. for this breach of policy and advised that he would correct the procedure. (Stipulated Facts ¶ 16.) Superintendent Shafer has now implemented a new procedure so that students do not visit the mobile classrooms without a signed Form, and that all future disbursement of the Forms will be consistent with those of any other outside entity who desires to distribute literature. (Stipulated Facts ¶ 17.) In particular, in the

---

8. H.S. asserted in the e-mail that her son cried because he was concerned that his teacher would be upset if he did not return the Form. (Def.'s Resp. Br. Ex. C.)

9. The parties stipulate that J.S.'s teacher never escorted the children to the trailer. (Stipulated Facts ¶ 18.)

future the Form is to be first presented to him for approval, and then disbursed and collected only through and by ACHC personnel.[10] (Stipulated Facts ¶ 17.)

Both H.S. and J.S. object to the School Corporation allowing ACHC's mobile classrooms on the grounds of Horace Mann for the conducting of the By the Book program during school hours. (Stipulated Facts ¶ 21.) H.S. pays property taxes in Huntington County, Indiana (Stipulated Facts ¶ 2), and is required to come to Horace Mann at certain times, such as for parent teacher conferences (Stipulated Facts ¶ 20). J.S., of course, encounters the mobile classroom at school.

Since the suit was filed, ACHC has explored the possibility of relocating its mobile classroom, but because of a nearby river, busy city streets, a scrap yard, and an ongoing business, they do not consider any of the property bordering the Horace Mann's campus to be a safe option. (Stipulated Facts ¶¶ 25, 26.) Therefore, if denied access to Horace Mann's property, ACHC would have to transport students to an off-site location, which it contends would be difficult to accomplish in the thirty minutes allotted by the School Corporation for the religious released time program. (Stipulated Facts ¶ 27.) Consequently, at present, the mobile classroom trailers continue to park on Horace Mann's parking lot during school hours on those days when religious instruction is offered. (Stipulated Facts ¶ 8.)

## IV. CONCLUSIONS OF LAW

### A. The School Corporation's Motion to Dismiss Should Be Denied Because H.S. and J.S. Have Standing.

■ As this Court has previously noted, "[u]nder Article III of the Constitution, a party must demonstrate standing in or-

der to satisfy the 'case or controversy' requirement necessary to the exercise of our judicial power." *Linnemeier v. Ind. Univ.-Purdue Univ. Fort Wayne*, 155 F.Supp.2d 1044, 1050 (N.D.Ind.2001) (citing *Simmons v. Interstate Commerce Comm'n*, 900 F.2d 1023, 1026 (7th Cir. 1990), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 242 (1991)). The burden of establishing standing falls upon the Plaintiffs. *Id.* (citing *Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir.2001)).

■ To have standing to sue in federal court, a "plaintiff must allege (1) that he has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision." *Books v. Elkhart County, Ind.*, 401 F.3d 857, 861 (7th Cir.2005) (internal quotation marks and citations omitted) ("*Books II* ").

Here, the entire issue of standing turns on whether either H.S. or J.S. can show that "an injury in fact" has occurred. This requires a brief recitation of what that phrase means in the context of an Establishment Clause claim.

■ The Seventh Circuit Court of Appeals has summarized an "injury in fact" as an " 'invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.' " *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In applying these concepts to Establishment Clause cases, however, the Seventh Circuit has noted that an injury in fact, and thus standing, can arise from a government display of a religious object if the plaintiff has undertaken a "special burden" or has altered his behavior to avoid the object that gives offense. *Id.* (citing

---

10. At this point, the Plaintiffs are not seeking an injunction concerning the procedure surrounding the distribution and return of the Forms.

*Books v. City of Elkhart,* 235 F.3d 292, 299 (7th Cir.2000) (*"Books I"*) (compiling cases)). But a change in behavior, although sufficient to confer standing, is not a prerequisite. *Books II,* 401 F.3d at 861 (citing *Books I,* 235 F.3d at 300); *Doe v. County of Montgomery, Ill.,* 41 F.3d 1156, 1160–61 (7th Cir.1994). In *Books I, Books II,* and *Doe,* the Seventh Circuit held that "it is enough for standing purposes that a plaintiff allege[s] that he 'must come into direct and unwelcome contact with the religious display to participate fully as [a] citizen[ ] ... and to fulfill ... legal obligations.'" *Id.* (citation omitted).

Although the trilogy of Seventh Circuit cases cited up to this point (*Books I, Books II,* and *Doe* ) are not Establishment Clause cases in the context of a public school, the principle that a plaintiff has standing if he is exposed to an unwelcome religious message actually derives, as *Books I* carefully notes, from a long line of public school cases involving a wide variety of religious messages, displays, or conduct. *See Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (student and parent objected to planned invocations and benedictions at non-mandatory graduation ceremonies); *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (school children and parents objected to one-minute period of silence); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam) (students and parents objected to posting of Ten Commandments); *School Dist. of Abington Twp. v. Schempp,* 374 U.S. 203, 205, 224 n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (school children and parents objected to reading of Bible in school although students could chose to be absent at that time or to not participate); *Berger v. Rensselaer Cent. Sch. Corp.,* 982 F.2d 1160, 1164 n. 4 (7th Cir.1993) (parent of school children objected to distribution of Gideon Bibles in the schools); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.,* 980 F.2d 437, 441 (7th Cir.1992) (student objected to recitation of Pledge of Allegiance).

This brief canvassing of the applicable law of standing gets to the core of the School Corporation's motion to dismiss. As the School Corporation sees it, all the Plaintiffs have alleged is that H.S. and J.S. may occasionally see one of the ACHC mobile classrooms near the entrance to Horace Mann and its playground, but that their exposure is harmless because the trailer is devoid of any exterior religious message or iconography. Indeed, the Plaintiffs' response brief confirms that their basis for standing relies at least in part upon the proposition that they must come into regular and unwelcome contact with the trailers knowing that religious instruction is taking place within them. (*See* Pl. Resp. Br. 7.)

Consequently, the School Corporation's motion argues that neither Plaintiff has alleged any special burden or altered behavior, and to the extent they claim unwelcome exposure to a religious message or display, that too must fail because a plain, generic trailer (even one used for religious instruction) offers no message (unwelcome or otherwise) and cannot be considered a religious display or religious activity.

At the outset, it seems odd that the Plaintiffs do not even allege that because of the mobile classroom's location at the front entrance of Horace Mann they have been forced to alter their travel, or incurred some other special burden to avoid it; for example, by detouring to the back door when arriving for school or school functions.[11] Clearly, such an allegation

---

11. Presumably, J.S., a third grade student, has limited ability to choose his route in or out of school, and it is unclear whether he can participate in recess at any other location than at the playground adjacent to the mobile classroom trailer.

would likely give them a clear path to standing under Seventh Circuit precedent. *See Books I*, 235 F.3d at 300–01 (citing *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 489 (7th Cir.2000); *Am. Civil Liberties Union v. City of St. Charles*, 794 F.2d 265, 269 (7th Cir.1986)).

 Judging from their argument, however, the Plaintiffs do not believe they need to make any "special burden" allegation because: (1) the Supreme Court has already determined that parents and children challenging released time programs at their schools have standing, *e.g., People of State of Ill. ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign County, Ill.*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); and (2) merely coming into direct and unwelcome contact with a religious display or activity while fulfilling a government obligation is sufficient to confer standing. *Books I*, 235 F.3d at 300 (citing *Doe*, 41 F.3d at 1160–61).

In any event, in a case such as this, the proper analysis concerning whether a plaintiff has standing to assert a violation of the Establishment Clause within the setting of a public school seemingly begins and ends with *McCollum*, 333 U.S. at 206–08, 68 S.Ct. 461 and *Zorach*, 343 U.S. at 309 n. 4, 72 S.Ct. 679.

In *McCollum*, the plaintiff was a resident and taxpayer of the Champaign, Illinois, school district and a parent of a child enrolled in those schools. She challenged a joint public school and religious group program permitting privately-employed religious teachers to enter school classrooms during the school day to give thirty minutes of religious instruction to students released for that purpose. *Id.* at 203–10, 68 S.Ct. 461. Although the school board sought to dismiss the matter at the Supreme Court based on *McCollum's* alleged

lack of standing, the Supreme Court brushed that argument aside with no more analysis than simply that it was "without merit." *McCollum*, 333 U.S. at 206, 68 S.Ct. 461.

In *Zorach*, another case challenging a released time program, this one in New York City, the plaintiffs were city taxpayers and residents, as well as the parents of children in its public schools. *Zorach*, 343 U.S. at 309, 72 S.Ct. 679. In offering a brief comment on standing, the Supreme Court noted that unlike the plaintiffs in *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), a case challenging a New Jersey statute requiring the reading of Old Testament verses at the start of every school day and subsequently dismissed for lack of standing, there was no problem with jurisdiction because the *Zorach* plaintiffs "are parents of children currently attending schools subject to the released time program." *Zorach*, 343 U.S. at 309 n. 4, 72 S.Ct. 679.

Moreover, and although not a case challenging a released time program, the Supreme Court case of *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), makes clear that when posing an Establishment Clause challenge to school practices, school children and their parents directly affected by the practices "surely" have standing to complain. *Id.* at 225 n. 9, 83 S.Ct. 1560.

Consequently, it is most likely that these are the cases District Judge McKinney of the Southern District of Indiana had in mind when he noted in passing in a case quite similar to this one, but where standing was not challenged, that the plaintiff appeared to have standing both as a taxpayer and parent of a school child. *Moore v. Metro. Sch. Dist. of Perry Twp.*, No. IP 00–1859–C–M/S, 2001 WL 243292, at *3 n. 1 (S.D.Ind. Feb. 7, 2001).

Accordingly, under this clear line of cases, stretching back to *McCollum* and *Zorach*, the Plaintiffs have standing to challenge the released time program at Horace Mann.

And to the extent that the School Corporation asserts that the Plaintiffs have no standing because the mobile classroom gives no outward sign that it is a place of religious instruction, the case of *Doe v. Village of Crestwood, Illinois*, 917 F.2d 1476 (7th Cir.1990), seems to provide the answer. There, the Seventh Circuit found that a plaintiff had standing to challenge the constitutionality of a Catholic mass scheduled to be held within a tent in a public park during a municipally-sponsored festival. The tent normally housed the festival's beer garden, but on this occasion its interior would contain an alter, a cross, and lighted candles during the mass. *Id.* at 1478. The Seventh Circuit reasoned, "Doe represents that he will stay away from the Festival while the mass is underway. But for the mass, the tent would be used as a beer garden [during that time], so Doe suffers … injury … and has standing." *Id.* (citing *ACLU v. City of St. Charles*, 794 F.2d 265, 267–69 (7th Cir.1986)).

*Doe* suggests that if a plain tent converted to host religious services on public property is enough to confer standing, as direct contact with it would be unwelcome, then certainly a plain mobile classroom used for religious instruction should be viewed the same way. The only distinction between *Doe* and the Plaintiffs here is that H.S. and J.S. do not have the option to simply stay away, given Indiana's school

attendance laws. *Sherman*, 980 F.2d at 441.

Ultimately, of course, both the question of standing and the merits have less to do with the form or outward appearance of the structure, and more to do with whether the Plaintiffs can challenge and seek to enjoin the activity occurring there on public property. *Doe*, 917 F.2d at 1478; *Hawley v. City of Cleveland*, 773 F.2d 736, 739 (6th Cir.1985) (finding that plaintiffs had standing to challenge the constitutionality of a chapel room in a municipal airport), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986). Since these Plaintiffs have standing to sue, it is recommended that the School Corporation's Motion to Dismiss be denied.[12]

### B. A Preliminary Injunction Should Issue.

The Plaintiffs request in their motion for a preliminary injunction that the School Corporation be enjoined from permitting ACHC to park its mobile classrooms on school grounds during school hours for purposes of religious instruction, as violative of the Establishment Clause. The School Corporation disputes that claim and contends that the Plaintiffs have failed to meet their burden for a preliminary injunction.

### 1. Preliminary Injunction Standard

■ A preliminary injunction is a remedy for exceptional circumstances, to be used only when a case clearly demands it. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir.2008). "To determine whether a situation warrants such a reme-

---

12. H.S. also has standing to sue as J.S.'s guardian. *See Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir.1992) ("[Minor plaintiff], obliged by the school-attendance laws to be present during the Pledge and the potential object of

coercion to participate, has standing to challenge the statute. *His father has derivative standing as his guardian.*" (internal citation omitted) (emphasis added)); *see also* Fed. R.Civ.P. 17(a)(1) (providing that a guardian is a real party in interest).

dy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Id.* at 1085–86.

A party seeking a preliminary injunction must first survive the three requirements of the threshold phase. *Id.* at 1086. "First, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims. Second, that traditional legal remedies would be inadequate. And third, that its claim has some likelihood of succeeding on the merits." *Id.* (citations omitted). If the moving party meets these criteria, then the court proceeds to the balancing phase of the analysis. *Id.*

"In this second phase, the court, in an attempt to minimize the cost of potential error, must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest[.]' " *Id.* (internal quotation marks and citations omitted). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* To accomplish this, the court employs "a sliding scale approach: [t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (internal quotation marks and citations omitted). When appropriate, the court should also balance the effects of granting or denying the preliminary injunction on nonparties, often referred to as "the public interest." *Id.*

As the Seventh Circuit Court of Appeals has recently explained, "[t]aking into account all these considerations, the district court must exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (internal quotation marks and citations omitted).

### 2. Application of the Law

As discussed in this section, the Plaintiffs easily clear the three preliminary injunction threshold hurdles.

*a. If the preliminary injunction is not granted, the Plaintiffs will suffer irreparable harm for which traditional legal remedies are inadequate.*

"A First Amendment violation, even for 'minimal periods of time,' is 'unquestionably .... irreparable injury.' " *Moore,* 2001 WL 243292, at *6 (quoting *Kimbley v. Lawrence County, Ind.,* 119 F.Supp.2d 856, 873–74 (S.D.Ind.2000) (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality))) (internal quotation marks omitted); *see also Doe v. Shenandoah County Sch. Bd.,* 737 F.Supp. 913, 916 n. 2 (W.D.Va.1990) (noting that although *Elrod* "involved First Amendment rights arising out of the Free Speech clause, that creates no distinction from the present [Establishment Clause] case. Only the most metaphysical could debate which is more important to the basic core of American values, religious freedom or freedom to speak."). Moreover, the School Corporation apparently does not dispute that there is an inadequate remedy at law in this instance. Consequently, the first two threshold factors of the preliminary injunction analysis are met.

*b. The Plaintiffs are likely to succeed on the merits.*

*i. Establishment Clause Standards and Released Time Program Jurisprudence*

██ The First Amendment demands that "Congress shall make no law respect-

ing an establishment of religion, or prohibiting the free exercise thereof," U.S. Const. amend. I, and this directive applies to the states through the Fourteenth Amendment, *Berger*, 982 F.2d at 1168 (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). "Under the Establishment Clause, the government may not aid one religion, aid all religions or favor one religion over another." *Berger*, 982 F.2d at 1168–69 (citing *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947)).

As previously discussed, the United States Supreme Court has addressed two cases asserting Establishment Clause challenges to released time programs: *McCollum*, 333 U.S. 203, 68 S.Ct. 461, and *Zorach*, 343 U.S. 306, 72 S.Ct. 679, and a brief discussion of each will advance the analysis.

In *McCollum*, the Champaign, Illinois, public schools allowed private religious groups to come into school classrooms weekly during instructional hours to teach religious classes to students in the fourth through ninth grades. *McCollum*, 333 U.S. at 207–08, 68 S.Ct. 461. The groups employed the religion teachers at no expense to the school, but they were subject to the approval and supervision of the school superintendent. *Id.* at 208, 68 S.Ct. 461. Students who did not participate were required to go to different classrooms to continue their secular studies. *Id.* at 209, 68 S.Ct. 461. Students whose parents consented were released from their regular classes to attend the religious classes, and their attendance was reported to the school. *Id.* Parental consent was obtained through consent forms disbursed to the students by their regular teachers, but returned to the religion teachers either through the secular teachers or the students themselves. *Id.* at 207 n. 2, 68 S.Ct. 461.

The United States Supreme Court found that these facts showed "the use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education." *Id.* at 209, 68 S.Ct. 461. The Court determined that the school assisted and was integrated with the program, and "this is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith[,]" falling "squarely under the ban of the First Amendment . . . ." *Id.* at 209–10, 68 S.Ct. 461 (citing *Everson*, 330 U.S. at 1, 67 S.Ct. 504). The Court emphasized that not only were the tax-supported public school buildings being used to disseminate religious doctrines, but the state was affording such "groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the state's compulsory public school machinery." *Id.* at 212, 68 S.Ct. 461.

Four years after *McCollum*, the Supreme Court again addressed the issue of released time programs in public schools. In *Zorach*, 343 U.S. 306, 72 S.Ct. 679, the Supreme Court upheld the school's released time program because unlike the situation in *McCollum*, New York City simply permitted, with parental consent, "its public schools to release students during the school day so that they *may leave the school buildings and school grounds* and go to religious centers for religious instruction[.]" *Zorach*, 343 U.S. at 308, 72 S.Ct. 679 (emphasis added). The children who were not released stayed in their classrooms, while the churches reported to the school the attendance of the participating students. *Id.* In distinguishing that situation from *McCollum*, the Court emphasized, "This 'released time' program involves neither religious instruction in public school classrooms nor the expenditure of public funds[,]" unlike in *McCollum*

where "classrooms were turned over to religious instructors." *Id.* at 308–09, 72 S.Ct. 679. "No one [was] forced to go to the religious classroom and no religious exercise or instruction is brought to the classrooms of the public schools[,]" and there was no threat of coercion, since the school authorities "do no more than release students whose parents so request." *Id.* at 311, 72 S.Ct. 679.

> Ultimately the *Zorach* Court concluded: In the *McCollum* case the classrooms were used for religious instruction and the force of the public school was used to promote that instruction. Here, as we have said, the public schools do no more than accommodate their schedules to a program of outside religious instruction. We follow the *McCollum* case. But we cannot expand it to cover the present released time program unless separation of Church and State means that public institutions can make no adjustments of their schedules to accommodate the religious needs of the people. We cannot read into the Bill of Rights such a philosophy of hostility to religion.

*Id.* at 315, 72 S.Ct. 679.

In the decades following *McCollum* and *Zorach,* a prevailing approach to evaluating Establishment Clause cases developed, as first set forth in the United States Supreme Court case of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). "The so-called *Lemon* test has evolved through a series of cases such that a court must inquire (1) whether the government has the purpose of endorsing religion, (2) whether the effect of the government's action is to endorse religion, and (3) whether the policy or practice fosters an excessive entanglement between government and religion." *Berger,* 982 F.2d at 1169 (citing *County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 592, 109 S.Ct.

3086, 106 L.Ed.2d 472 (1989)). State action violates the Establishment Clause if it fails to satisfy any of these prongs. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

To determine whether government action has the effect of advancing religion, the "effect prong" has been analyzed under the "perception of endorsement" framework first developed in Justice O'Connor's concurring opinion in *Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). *Freedom from Religion Found., Inc. v. City of Marshfield, Wis.,* 203 F.3d at 493. "Under this test, [t]he effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Id.* (internal quotation marks and citation omitted). "When we find that a reasonable person could perceive that a government action conveys the message that religion or a particular religious belief is *favored* or *preferred,* the Establishment Clause has been violated." *Id.* (citations omitted) (emphasis in original).

Since its inception, the *Lemon* test has been criticized and its viability questioned, *see, e.g., Wallace,* 472 U.S. at 68, 105 S.Ct. 2479 (O'Connor, J., concurring). Nevertheless, it remains the prevailing standard for analyzing Establishment Clause cases. *Books II,* 401 F.3d at 862–63 ("*Lemon* has not been overruled, and we are compelled to follow the approach it established."). Although *Zorach* and *McCollum* predate the *Lemon* test's jurisprudence, they remain authoritative, *see, e.g., Pierce v. Sullivan W. Cent. Sch. Dist.,* 379 F.3d 56 (2nd Cir.2004) (finding the holding in *Zorach* to be controlling in a challenge to a released time program), and have been considered along with the *Lemon* test in Establishment Clause claims in the context of public schools, *see, e.g., Smith v. Smith,* 523 F.2d

121, 124–25 (4th Cir.1975) (finding that *Zorach* is not inconsistent with the *Lemon* test); *Moore*, 2001 WL 243292, at *3–6 (analyzing a school's released time program utilizing both *Zorach* and *McCollum* and the *Lemon* test). Thus, the parties here have quite properly analyzed this case using the principles articulated in *Zorach* and *McCollum* as well as *Lemon*. However, no matter which analysis is applied to the facts at hand, it is likely that the Plaintiffs will prevail.

### ii. *Analysis of the Likelihood of Success on the Merits*

#### a. *McCollum and Zorach*

While both *McCollum* and *Zorach* afford useful guidance, neither purports to draw the precise line between church and state in connection with released time cases. Certainly, if the religious instruction occurs in a public classroom and the school assists and is integrated into the program such that it provides the pupils for those classes, then an Establishment Clause violation has occurred. *McCollum*, 333 U.S. at 209–10, 68 S.Ct. 461. At the other pole, the program in *Zorach* did not offend the First Amendment because it permitted students to "leave the school buildings *and school grounds* and go to religious centers for religious instruction or devotional exercises." *Zorach*, 343 U.S. at 308, 72 S.Ct. 679 (emphasis added).

Admittedly, many of the troublesome factors cited in *McCollum* and subsequent released time cases are not present here. For instance, the School Corporation is not providing utilities or other financial support for the program; it is not involved in By the Book's curriculum or responsible for hiring and supervising its teachers; its elementary teachers do not take the students to the mobile classrooms; the method of distribution and collection of the Form is not presently challenged; and ACHC personnel are not permitted in

Horace Mann's classrooms to recruit participants. *Cf. McCollum*, 333 U.S. 203, 68 S.Ct. 461; *Moore*, 2001 WL 243292 (granting a motion for preliminary injunction where released time program occurred in trailers in the school's parking lot, superintendent had input in the curriculum, school previously paid for trailers' utilities, and non-participating students were forbidden from doing school-related work during released time); *Lanner v. Wimmer*, 662 F.2d 1349 (10th Cir.1981) (holding that a school's collection of a released time program's attendance slips violated the Establishment Clause); *Shenandoah County Sch. Bd.*, 737 F.Supp. at 913 (granting a temporary restraining order stopping a released time program that occurred in buses on school grounds, where the religious instructors entered the school to recruit students, and the public school teachers distributed and collected the enrollment cards and encouraged participation); *Doe v. Human*, 725 F.Supp. 1503 (W.D.Ark. 1989) (holding that a public school's elective Bible classes taught in the school's building during school hours violated the Establishment Clause), *aff'd without opinion*, 923 F.2d 857 (8th Cir.1990), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991).

Thus, the case here is essentially stripped to this ultimate question—is religious instruction to elementary students on public school property during the school day, in a church-owned mobile classroom, violative of the Establishment Clause? The answer is found in the over-arching principle articulated in *McCollum*; that is, "the use of *tax-supported property* for religious instruction" and the "utilization of the *tax-established and tax-supported public school system* to aid religious groups to spread their faith[,]" makes the program unconstitutional. *McCollum*, 333 U.S. at 209–10, 68 S.Ct. 461 (emphasis added).

Furthermore, other courts have also noted that using any school property for religious instruction, not simply classrooms, raises Establishment Clause issues. *See, e.g., County of Allegheny,* 492 U.S. at 591, 109 S.Ct. 3086 (citing *McCollum* for the proposition that a "State may [not] allow public-school students to receive religious instruction *on public-school premises* ....") (emphasis added); *Lanner,* 662 F.2d at 1357 ("Notwithstanding continuing scholarly debate, it is clear that released-time programs permitting attendance at religious classes *off school premises* do not *per se* offend the establishment and free exercise clauses.") (emphasis added); *Shenandoah County Sch. Bd.,* 737 F.Supp. at 918 ("The primary distinction between this case and both *Smith [v. Smith,* 523 F.2d 121 (4th Cir.1975)] and *Zorach* is that the religious education is taking place on what appears to be *school property.*") (emphasis added); *Human,* 725 F.Supp. at 1507 ("In the court's view, if an evidently religious study course is taught *on school grounds* during regular school hours, the school is excessively entangled in it regardless of who teaches such classes.") (emphasis added).

Notably, as the Plaintiffs highlight, the School Corporation has pointed to no case upholding the constitutionality of a released time religious education program held on public school property during school hours. In any event, the facts of this case are clearly distinguishable from *Zorach* and other released time cases where the programs were upheld, since in those cases the instruction took place off-premises. *See Zorach,* 343 U.S. 306, 72 S.Ct. 679; *Pierce ex rel. Pierce v. Sullivan West Cent. Sch. Dist.,* 379 F.3d 56, 60 (2nd Cir.2004) (upholding a released time program in part because it "involve[d] no *on-site* religious instruction") (emphasis added); *Smith,* 523 F.2d at 121 (upholding a released time program and distinguishing

it from *McCollum* because it took place off school grounds).

In light of the fact that the religious education program is occurring on tax-supported, public school grounds during school instructional hours, this case is more akin to *McCollum* than *Zorach.* Consequently, the Court should find that Plaintiffs are likely to succeed on the merits of their claim.

b. *The Lemon Test*

Applying the *Lemon* test to the facts reinforces the conclusion that the School Corporation's implementation of its released time program violates the Establishment Clause. Although the Plaintiffs contend that the program does not survive any of the three prongs of the test, at the very least it fails to meet either the secular purpose or effect criteria.

1. The Secular Purpose Prong

■ To begin, the School Corporation has not established that allowing ACHC's mobile classroom trailers on school property to conduct religious education has a primarily secular purpose. *See Books I,* 235 F.3d at 304 n. 8 (collecting cases indicating that the burden of showing a secular purpose is on the government). "[W]e generally defer to the government's articulated purpose as long as it is not a sham." *Books II,* 401 F.3d at 863 (internal quotation marks and citation omitted). "The Supreme Court has held that government action lacks a valid secular purpose under *Lemon* only when there is 'no question that the statute or activity was motivated wholly by religious considerations.'" *Books II,* 401 F.3d at 863 (quoting *Lynch,* 465 U.S. at 680, 104 S.Ct. 1355). The secular purpose requirement, however, "does not mean that the government's purpose must be unrelated to religion." *Id.* (internal quotation marks and citation omitted).

The School Corporation first argues that its "release[d] time policy maintains a pri-

marily secular purpose in that it specifically states that 'The School Board desires to cooperate with those parents who wish to provide for religious instruction but also recognize its responsibility to enforce the attendance requirements of the State.'" (Def.'s Resp. Br. 10 (citing Shafer Aff. Ex. A).)

Indeed, as the School Corporation notes, accommodating parental desires may be an acceptable purpose for such a policy. *See Lanner*, 662 F.2d at 1357; *Smith*, 523 F.2d at 124. The problem here, however, is not the released time policy itself, but the School Corporation's *effectuation* of that policy. In other words, though the School Corporation may release the children to accommodate parental and associational scheduling needs, *see Zorach*, 343 U.S. at 313–14, 72 S.Ct. 679 ("When the state encourages religious instruction or cooperates with religious authorities *by adjusting the schedule of public events* to sectarian needs, it follows the best of our traditions.") (emphasis added), its action with respect to the By the Book program extends beyond mere cooperation with ACHC's schedule. It affords ACHC access to the school's property (and its students) to carry out and in effect promote its religious education "ministry." (*See* Verified Compl. Ex. 1.) *See Books II*, 401 F.3d at 863 ("[T]he purpose requirement 'aims at preventing the relevant governmental decision maker … from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'") (quoting *Am. Jewish Cong. v. City of Chicago*, 827 F.2d 120, 126 (7th Cir.1987)).

The School Corporation also says that allowing the classes on school grounds advances the secular purpose of ensuring student safety. Although student safety is undeniably important, the school apparently sees its role as overseer of student safety as ending, at least in this context, when the children exit the school building, because that is where the ACHC teacher meets them.[13] (Stipulated Facts ¶ 18.) Stated simply, the school believes that getting the children safely to religious education is something for the parents or the religious program to do, and Indiana law seems to confirm that view. *See* Ind.Code § 20–33–2–19(a) (providing only that the principal "allow [a] student to attend" religious instruction). Therefore, this argument is not entitled to the usual deference. *See Books II*, 401 F.3d at 863.

### 2. The "Effect" Prong

Even if the Court were to accept that the School Corporation had a secular purpose for allowing the religious instruction to occur on school grounds, this practice nevertheless fails to satisfy the "effect" prong of the *Lemon* test, which "asks whether, irrespective of [the] government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Freedom from Religion Found., Inc.*, 203 F.3d at 493. The Establishment Clause is violated if a reasonable person could perceive that a government action conveys a message that a particular religion is favored or preferred. *Id.* "'Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or

---

**13.** The School Corporation's concern about student safety on school grounds seems a little selective in this context, since the Superintendent does not know exactly how the children are getting to and from the mobile classroom or the means of supervision while they do so. (*See, e.g.,* Shafer Dep. 20–22.) More-over, although the School Corporation is probably vigilant concerning strangers coming onto elementary school grounds, it apparently knows little or nothing about the ACHC teachers, including even their identities. (*See* Jan. 21, 2009, Hr'g.)

disapproval of religion.'" *Am. Jewish Cong.*, 827 F.2d at 127 (quoting *Lynch*, 465 U.S. at 694, 104 S.Ct. 1355 (O'Connor, J., concurring)); *see also Linnemeier v. Ind. Univ.-Purdue Univ. Fort Wayne*, 155 F.Supp.2d 1034, 1042 n. 8 (N.D.Ind.2001) ("The law requires the court to go beyond the particularized perceptions of individuals and inquire into the mind of a reasonable observer deemed aware of the history and context of the community and forum in which the religious [speech takes place]." (internal quotation marks and citations omitted)).

Given this framework, a reasonable person is likely to conclude that the School Corporation is endorsing religion in this instance. After all, what was said of the school corporation in *Moore*, 2001 WL 243292, at *5, can be said of the School Corporation here: "[i]t allows a particular religious association access to the students at the beginning of the school year to promote its religious program [and] it allows that same association to bring trailers onto school property to conduct its religious education classes . . . ." Indeed, the School Corporation has seemingly granted ACHC a unique and unlimited license, permission to pull a mobile classroom so close to the school that to impressionable elementary school students, religious instruction appears to be on par with, perhaps indistinguishable from, their secular studies.[14] *See Berger*, 982 F.2d at 1169–70 ("Many cases have focused on the impressionability of students in elementary and secondary schools and the pressure they feel from teachers, administrators and peers." (citing *Edwards*, 482 U.S. at 584, 107 S.Ct. 2573; *Lee*, 505 U.S. at 592, 112 S.Ct. 2649)). Given these facts, the Plaintiffs have established a likelihood of success under the "effects" prong of the *Lemon* test.

Because the School Corporation's practice fails to satisfy at least two prongs of the *Lemon* test, the Court need not delve into the third prong, excessive entanglement between the school system and the ACHC. *See Moore*, 2001 WL 243292, at *5. However, it may be worth noting that there is at least some authority for the notion that religious instruction occurring on school grounds during school hours conceivably involves excessive entanglement. *See Human*, 725 F.Supp. at 1507 ("In the court's view, if an evidently religious study course is taught *on school grounds* during regular school hours, the school is excessively entangled in it regardless of who teaches such classes.") (emphasis added).[15]

14. The School Corporation argues that this case is more akin to the facts in *Sherman v. Community Consolidated School District 21 of Wheeling Township*, 8 F.3d 1160 (7th Cir. 1993). (Def.'s Resp. Br. 14–15.) In that case, the Seventh Circuit Court of Appeals found that a school did not violate the Establishment Clause by allowing the Boy Scouts of America ("BSA") to use the school's facilities for meetings and to distribute flyers in the school. *Sherman*, however, is distinguishable from the instant case. The BSA was simply one of many community organizations using the school's facilities and disseminating flyers in accordance with the school's policy. The school's practice here is much more likely to be perceived by a reasonable person as preferential, an outright endorsement of religion, since the mobile classroom itself offers a physical reminder that ACHC enjoys unique status with the school. Indeed, some observers may view the trailer, the program, and the school as indistinguishable.

15. In arguing that there is no excessive entanglement in this instance, the School Corporation attempts to liken the instant facts to those of *Pulido v. Cavazos*, 934 F.2d 912 (8th Cir. 1991). In that case, the Court of Appeals for the Eighth Circuit upheld the use of mobile classroom units to provide Title I remedial services to low-income students in parochial schools. However, that case is clearly distinguishable, since the use of public school property to teach religious education is very different from the use of parochial school property to conduct remedial services. The problem here is not just that there are church-owned

In sum, regardless of whether this case is evaluated under the principles of *Zorach* and *McCollum* or under the *Lemon* test, the Plaintiffs are likely to succeed on the merits of their claim.

### c. The balance of harm considerations favor the Plaintiffs.

Because the Plaintiffs have passed the threshold inquiry, a balancing of several factors must be done to determine if an injunction should issue.

In this instance, there is a strong likelihood that the Plaintiffs will succeed in establishing that the School Corporation is violating their First Amendment rights, an irreparable harm. *See Moore*, 2001 WL 243292, at *6. On the other hand, a preliminary injunction ordering the removal of ACHC's mobile classroom to another site would hardly affect the School Corporation, since By the Book is not the School Corporation's program.

Although the School Corporation argues that it would be harmed by an injunction requiring removal of the mobile classroom because it would jeopardize student safety (a point only conclusorily asserted), they have already ceded that responsibility to ACHC, as noted earlier. And besides, the inconvenience to the school and students is minimal, particularly if the released time period is slightly expanded to allow for transport. *See Moore*, 2001 WL 243292, at *7 ("[T]o the extent students are inconvenienced by having to attend the [released time program] at a location off school property, that harm is minimal.").

The School Corporation nevertheless maintains that if the preliminary injunction is granted, Horace Mann will lose instructional time to accommodate the unspecified extra minutes required for ACHC to

mobile classroom trailers on school property, but that *religious education* is occurring in

transport students to an off-site location. The argument is rather transparently thin, however, since the School Corporation already has a policy that allows for up to 120 minutes a week for religious released time instruction, and thus it would seem that it has already determined that a program four times longer than the one currently offered has no detrimental effect on student education.

In short, the School Corporation faces minimal harm if a preliminary injunction is granted, while the Plaintiffs face irreparable harm in the nature of a violation of their First Amendment rights. Therefore, the balance of harm clearly favors the Plaintiffs.

Finally, the Court must consider the effect of the preliminary injunction on the public interest. Towards that end, it is argued that the injunction would frustrate the operation of a program that ACHC and many parents desire to keep in place. The issue, however, is not whether the By the Book program continues, but the narrower one of whether it must continue on School Corporation property. If the mobile classrooms are removed to a location off-site from Horace Mann, it will be up to the parents to determine whether they wish to have their children participate for a greater part of the school day. Moreover, it cannot be ignored that protection of First Amendment rights is also in the public's interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir.2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). In short, ACHC's inconvenience as a result of the preliminary injunction does not outweigh the harm of perpetuating a constitutional violation.

those trailers during school hours.

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Plaintiffs' Motion for Preliminary Injunction (Docket # 13) be GRANTED, and that the School Corporation's Motion to Dismiss (Docket # 32) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R.Civ.P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir.1995); *Egert v. Conn. Gen. Life Ins. Co.,* 900 F.2d 1032, 1039 (7th Cir.1990).

SO ORDERED.

Enter for this 3rd day of February, 2009.